**F I L E D**
IN THE 13TH COURT OF APPEALS
CORPUS CHRISTI

9/3/15

**DORIAN E. RAMIREZ, CLERK**
**BY** DTello

ACCEPTED
13-13-00633-CR
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
9/3/2015 5:12:04 PM
Dorian E. Ramirez
CLERK

NO. 13-13-0633-CR

RECEIVED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
9/3/2015 5:12:04 PM
DORIAN E. RAMIREZ
Clerk

In the Thirteenth Court of Appeals
Edinburg, Texas

GUADALUPE DELEON ACUNA
Appellant

v.

State of Texas
Appellee

On Appeal from Cause Number CR-4071-11-H
389TH Judicial District Court of Hidalgo County, Texas
Hon. Jaime Garza Presiding

**AMENDED APPELLANT'S BRIEF**

NO ORAL ARGUMENT REQUESTED

O. RENE FLORES
State Bar Number 24012637
O. Rene Flores, P.C.
1308 S. 10th Avenue
Edinburg, Texas 78539
(956) 383-9090 Telephone
(956) 383-9050 Facsimile
Counsel for Appellant

## IDENTITY OF PARTIES AND COUNSEL

**Appellant**
Guadalupe DeLeon Acuna

**Appellate Counsel**
Oscar Rene Flores
O. Rene Flores, P.C.
1308 S. 10th Avenue
Edinburg, Texas 78539
(956) 383-9090 Tel.
(956) 383-9050 Fax

**Trial Counsel**
Rogelio Garza
310 West University
McAllen, Texas 78539
(956) 316-1375 Tel.

**And**

Abiel Flores
10213 N. 10th Street
McAllen, Texas 78504
(956) 386-0642 Tel.

**Appellee**
State of Texas

**Trial Counsel**
Hope Davis Palacios
Hidalgo County DA
Asst. Crim. D.A.
100 N. Closner
Edinburg, Texas 78539
(956) 318-2300 Tel.
(956) 318-2301 Fax

**Appellate Counsel**
Theodore "Ted" Hake
Hidalgo County DA
Appellate Division
100 N. Closner
Edinburg, Texas 78539
(956) 318-2300 Tel.
(956) 318-2301 Fax

## TABLE OF CONTENTS

**IDENTITY OF PARTIES AND COUNSEL**...................................................2

**TABLE OF CONTENTS**............................................................................3

**INDEX OF AUTHORITIES**.......................................................................4

**NOTE RGARDING CITATION**..................................................................10

**STATEMENT OF THE CASE**....................................................................12

**STATEMENT REGARDING ORAL ARGUMENT**........................................13

**ISSUES PRESENTED**...............................................................................14

**STATEMENT OF FACTS**..........................................................................14

**SUMMARY OF THE ARGUMENT**............................................................17

**ARGUMENT**............................................................................................18

Issue One...................................................................................................18

Issue Two...................................................................................................19

Issue Three................................................................................................19

**CONCLUSION**.......................................................................................119

**PRAYER**...............................................................................................124

**CERTIFICATE OF SERVICE**.................................................................125

# INDEX OF AUTHORITIES

**CASES**

- <u>Abbate v. United States</u>, 359 U.S. 187 (1959)………………44

- *Abney v. U.S.,* 431 U.S. 651, 660-62 (1977)………………21

- *Ashe v. Swenson,* 397 U.S. 436, 445 n. 10 (1970)…………… ……………………………………23, 27, 28, 29,30, 52

- *Bartkus v. Illinois*, 359 U.S. 121 (1959)……………………44

- *Blockburger v. United States,* 284 U.S. 299, 304 (1932)……………………………………19, 39

- *Brown v. Ohio*, 432 U.S. 161 (1977)………………………38,39

- *Crist v. Bretz,* 437 U.S. 28,29 (1978)………………20, 48

- *Ex Parte Lange,* 85 U.S. 163, 168-169 (1873)………………20

- <u>Flittie v. Solem</u>, 775 F.2d 933 (8th Cir. 1985), *cert. denied*, 475 U.S. 1025 (1986)………………37, 39, 43

- *Green v. United States*, 355 U.S. 184, 187-88 (1957) ……………………………………38, 43,47, 51

- *Harris v. Washington*, 404 U.S. 55 (1971)……………………35

- *Heath v. Alabama*, 474 U.S. 82 (1985)……………………44

- *Hicks v. Unied States*, 108 S.Ct. 95 (1987)………………36

- *Hoag v. New Jersey*, 356 U.S. 464 (1958)...................................27

- *Iannelli v. United States*, 420 U.S. 770 (1975)...............39

- *Illinois v. Vitale*, 447 U.S. 410 (1980)...............................................39, 40, 41, 42,46

- *Illinois v. Somerville*, 410 U.S. 458, 463 (1973)...............................................................50

- *People v. Goodman*, 69 N.Y. 2d 32, 36-44, 503 N.E.2d35 996, 999-1003, 511 N.Y.S.2d 565, 568-72 (1986)...............37

- *Pinkerton v. United States,* 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489.......................................................57

- *Riley v. State*, 181 Ga. App. 667, 353 S.E.2d 598 (1987).................................................................36

- *Sanabria v. United States*, 437 U.S. 54, 64 (1978)......50

- *Sealfon v. United States,* 332 U.S. 575, 579, 68 S. Ct. 237, 92 L. Ed. 180 (1947)..............................25, 26,50,77

- *Simpson v. Florida*, 403 U.S. 384 (1971)....................35

- *Standefer v. United States*, 447 U.S. 10 (1980).............35

- *The Evergreens v. Nunan,* 141 F.2d 927 (2d Cir. 1944) *cert. denied*, 323 U.S. 720 (1944)...........................37

- *Turner v. Arkansas*, 407 U.S. 366 (1972)..............................35

- *United States v. Adams,* 281 U.S. 202 (1930)......................25

- *United States v. Addington*, 471 F.2d 560, 566 (10th Cir. 1973)..............................................................................44

- *United States v. Crispino*, 586 F.Supp. 1525 (D.N.J. 1984)..............................................................57, 58, 59,60

- *United States v. Day*, 591 F.2d 861 (D.C. Cir. 1978)..............................................................................36

- *United States v. Deerman,* 837 F.2d 684, 690 (5th Cir.1988)..............................................................................20

- *United States v. Gentile*, 816 F.2d 1157 (7th Cir. 1987)..............................................................................37

- *United States v. Gornto*, 792 F.2d 1028 (11th Cir. 1986)3..............................................................................36

- *United States v. Johnson*, 697 F.2d 735 (6th Cir. 1983), *cert. denied sub nom.* ..............................36

- *United States v. Keller*, 624 F.2d 1154 (3d Cir. 1980) ..............................................................................36

- *United States v. Kills Plenty,* 466 F.2d 240 (8th Cir. 1972), *cert. denied,* 410 U.S. 916 (1973)

……………………………………………………………………43, 44, 45,46

- *United States v. Larkin*, 605 F.2d 1360, 1361 (5th Cir. 1979), cert. denied, 446 U.S. 939 (1980)……………………………25

- *United States v. Levy*, 803 F.2d 1390, 1397 (5th Cir. 1986)………………………………………………………………39

- *United States v. Mespoulede*, 597 F.2d 329 (2d Cir. 1979)………………………………………………………………36,37

- *United States v. Mock*, 640 F.2d 629 (5th Cir. 1981)………………………………………………………………59

- *United States v. Mock*,604 F.2d 341 (5th Cir. 1979)………………………………………………………………58

- *United States v. One Assortment of 89 Firearms*, 465 U.S. 354 (1984) ………………………………………………36

- *United States v. Oppenheimer,* 242 U.S.85 (1916)………………………………………………………………25

- *United States v. Scott*, 437 U.S. 82 (1978)……………50, 51

- *United States v. Sutton*, 732 F.2d 1483 (10th Cir. 1984)………………………………………………………………37

- *United States v. Van Cleave*, 599 F.2d 954 (10th Cir. 1979)………………………………………………………………37

- *United States v. Watts,* 519 U.S. 148, 117 S. Ct.633, 136 L.Ed.2d 554 (1991)....................................................77

- *United States v. Wheeler*, 435 U.S. 313, 328 (1978)...43

- *Wingate v. Wainwright*, 464 F.2d 209 (5th Cir. 1972)....................................................36

- *Yawn v. United States,* 244 F.2d 235 (5th Cir. 1957)....................................................54

- *Yates v. United States,* 354 U.S. 298 (1957)...................37

**STATUTES**

- Texas Rules of Appellate Procedure 43 (O'Connor's Texas Criminal Codes Plus (2014-2015)

- TEX. Penal. Code Ann. Section 15.02 O'Connor's Texas Criminal Codes Plus (2010-2011)

- TEX. Penal. Code Ann. Section 19.02 (O'Connor's Texas Criminal Codes Plus (2010-2011)

## Secondary Sources

- Black's Law Dictionary 6th Edition……………………………………………………78

- W. LAFAVE & J. ISRAEL, CRIMINAL PROCEDURE § 17.4 (1985)………………………………………………………………………………27

- Lugar, *Criminal Law, Double Jeopardy and Res Judicata*, 39 IOWA L. REV. 317 (1954)………………………………………27

- Mayers & Yarbrough, *Bis Vexari: New Trials and Successive Prosecutions*, 74 HARV. L. REV. 1 (1960)………………………………………………………………………………27

- Comment, *Twice in Jeopardy*, 75 YALE L.J. 262 (1965)…………………………………………………………………27,29

- Note, *The Double Jeopardy Clause as a Bar to Reintroducing Evidence*, 89 YALE L.J. 962 (1980)…………27

- Case Comment, *The Use of Nonmutual Collateral Estoppel by Criminal Defendants*: United States v. Standefer, 93 HARV. L. REV. 804 (1980)…………………………35

- Vestal, *Issue Preclusion and Criminal Prosecutions*, 65 IOWA L. REV. 281 (1980)……………………………………………36

- Note, *Evidentiary Use of Prior Acquitted Crimes: The "Relative Burdens of Proof" Rationale*, 64 WASH. U.L.Q. 189 (1986)................................................................37

- E. Imwinkelried, Uncharged Misconduct Evidence § 10.06 at 12 (1984)................................................................37

- Note, *Collateral Estoppel Effect of Prior Acquittals*: United States v. Mespoulede, 46 BROOKLYN L. REV. 781 (1980)................................................................37

- Note, *Perjury by Defendants: the Uses of Double Jeopardy and Collateral Estoppel*, 74 HARV. L. REV. 752, 758-59 (1961)................................................................37

- Model Rules Of Professional Conduct Rule 3.8(A) ................................................................55

- Thomas, *The Prohibition of Successive Prosecutions for the Same Offense: In Search of a Definition*, 71 IOWA L. REV. 323 (1986)Comment, *supra* note 12................................................................39

- Westen & Drubel, *Toward a General Theory of Double Jeopardy*, 1978 SUP. CT. REV. 81 (1979)................................................................50

## CONSTITUTUIONAL PROVISIONS

- Fifth Amendment to the Constitution of the United States of America ………………………………………………18, 34, 35,122

- Fourteenth Amendment to the Constitution of the United States of America……………………………………………………19, 122

## Note regarding citation

This appeal involves a double jeopardy challenge and as such required the undersigned to review the record on appeal in this case but also required review of the record from the previous trial ending in acquittal. As such, throughout this brief, counsel refers to both at different times. In an effort to assist this Honorable Court, the following citations are explained for easier reference throughout:

For the Clerk's Record in Trial Court Cause number CR-2725-10-H, counsel cites for example **1**CR@_, whereas reference to the second trial – the instant case – will be cited for example as **2**CR@_.

In addition, any reference to the Reporter's Record from the first trial will be cited for example as

**1**RR_@_, whereas any reference to the Reporter's Record in the second trial – this case - will be cited for example as "**2**RR_@_."

**TO THE HONORABLE JUSTICES OF THE THIRTEENTH COURT OF APPEALS:**

Appellant, Guadalupe DeLeon Acuna, files this brief requesting reversal of the trial court's judgment, rendering a judgment of acquittal on Count One.[1] Appellant Acuna respectfully shows:

## STATEMENT OF THE CASE

A. Course of Proceedings/Disposition in the Court Below.

This was a criminal case brought pursuant to Indictment in Hidalgo County Texas accusing Guadalupe Acuna (hereinafter referred to as Appellant Acuna) of Conspiracy to Commit Murder in trial court cause number CR-4760-11-H.

Prior to the instant prosecution, Appellant Acuna was indicted for the offense of murder and acquitted in Cause Number CR-2725-10-H. That case was tried to a jury and Appellant Acuna was acquitted.[2]

Then Appellant Acuna was indicted by a Hidalgo

---

[1] Count Two was dismissed by the State - (First Trial Clerk's Transcript) 1CR@204, 205
[2] (First Trial Clerk's Transcript) 1CR@206

County Grand Jury for the offense of Conspiracy to Commit Murder in Trial Court Cause Number CR-4071-11-H.[3] *This* case was tried to a jury which convicted Appellant Acuna and sentenced her to imprisonment in the Institutional Division of the Texas Department of Corrections for a period of twenty (20) years. This appeal ensued.[4]

<u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant Acuna is not requesting Oral Argument at this time.

---

[3] 1CR@3-4; This new indictment was based on the same criminal episode as that relied upon in the previous case, trial court cause number CR-2725-10-H, where Appellant Acuna was acquitted; 1CR@8, 200
[4] *See* TRAP 43; TEX. Penal. Code Ann. Section 15.02 & 19.02; CR@3, 304

**ISSUES PRESENTED**

**ISSUE ONE:**

Appellant Acuna's acquittal on the murder charge in Cause number CR-2725-10-H bars a subsequent trial on a charge of Conspiracy to Commit Murder - the same murder.

**ISSUE TWO:**

The trial court erred in denying defendant's Special Plea of Double Jeopardy.[5]

**ISSUE THREE:**

The doctrine of collateral estoppel bars the re-introduction of evidence previously admitted against Appellant Acuna where Appellant Acuna was acquitted of the same murder.[6]

**STATEMENT OF FACTS**

Appellant Acuna submits the following facts pertinent to the issues on appeal. In trial Court Cause Number CR-2725-10-H, Appellant Acuna was indicted for the offense of Murder.[7] The facts at trial were as

---

[5] 2CR@345, 327
[6] 2CR@199; RR2@4-14
[7] 1CR@8-9

follows. On July 3, 2010, at the Donna Lakes in Donna, Texas, Jose Guadalupe Fiscal was murdered. He was stabbed approximately 45 times and his body was burned as was his vehicle.[8] The investigation identified Antonio DeLeon and Juan Manuel Salazar as the "actual killers." They stabbed Fiscal; they burned his body.[9] The investigation identified Appellant Acuna as DeLeon's mother and Salazar's sister-in-law. They lived in Donna, Texas together with the victim, Fiscal.[10]

Fiscal, upon reconciling with his wife, Alma Fiscal, was attempting to break up with Appellant Acuna, who he'd been seeing and living with for some time.[11] The State alleged at trial that Appellant Acuna, in a fit of jealous rage, orchestrated a plan to kill Fiscal.[12] She was accused of "asking DeLeon and Salazar to kill Fiscal." It was the State's theory that Appellant Acuna wanted Fiscal dead and that she

---

[8] 2RR7@24-25; 1RR5@22-24
[9] 1RR3@41-42; 1RR4@53; 2RR7@110
[10] 2RR7@94-96; 1RR4@47
[11] 1RR5@160-161, 185; 2RR9@104
[12] 1RR2@98,128

was "criminally responsible" for acts committed by DeLeon and Salazar and the actual killing. According to the State, she was the one who "asked" Fiscal to take a drive to the crime scene; she was the one who "asked" DeLeon and Salazar to kill Fiscal.[13] These facts came out during a trial in the 389th District Court in trial court cause number CR-2725-10-H, where the jury, after deliberating on the Law of Parties, acquitted Appellant Acuna of Murder in April of 2011.[14]

Then in September of 2011, Appellant Acuna was indicted for "Conspiracy to Commit Murder." She once again was charged with the murder of Jose Guadalupe Fiscal, only this time charged with *conspiracy* to commit the same murder.[15] The defense entered a Special Plea in Bar claiming Appellant Acuna was being twice placed in jeopardy for the same offense citing the acquittal in CR-2725-10-H. That Special Plea was denied

---

[13] The first jury was asked to find that Appellant Acuna "asked" the victim to drive to the crime scene, whereas the second jury was asked to find that Appellant Acuna "lured Jose Guadalupe Fiscal to the location where he was killed." 1CR@196; 2CR@82
[14] 1CR@200
[15] 2CR@3-4

and Appellant Acuna was forced to run the gauntlet again.[16]

At trial, the State presented the same theory, witnesses and evidence as was presented to the first jury. Here, Appellant Acuna was accused of "performing over acts in furtherance of the conspiracy" to commit the murder by "*luring*" Fiscal to the place where was to be killed; She was accused of "*directing*" DeLeon and Salazar to kill Fiscal. This time, the jury convicted Appellant Acuna of Conspiracy to Commit Murder and the jury assessed punishment at imprisonment in the Institutional Division of the Texas Department of Corrections for a period of Twenty (20) years and a fine of $10,000.[17]

## SUMMARY OF THE ARGUMENT

Appellant Acuna was twice put in jeopardy for the "same offense" in violation of her rights under the Fifth Amendment and the Due Process Clause of the

---

[16] 2CR@327,345
[17] 2CR@87, 94

Fourteenth Amendment to the Constitution of the United States of America.

The Double-Jeopardy Clause does not necessarily bar subsequent prosecution for acts that can be proven and punished under different statutory provisions requiring proof of different elements.[18]

However, Collateral Estoppel guarantees "when an issue of ultimate fact has once been determined by a valid and final judgment, the issue cannot again be litigated between the same parties in any future lawsuit.

Collateral estoppel affects successive criminal prosecutions in two ways. First, it completely bars subsequent prosecution if a fact necessarily determined in the former trial is an essential element of the subsequent prosecution.[19] Second, where subsequent prosecution is allowed to proceed, collateral estoppel bars introduction or argumentation of facts necessarily

---

[18] *Blockburger v. United States,* 284 U.S. 299, 304 (1932).
[19] The first jury was instructed to deliberate on the Law of Parties; the second trial requires the element of an "agreement."

decided in the prior proceeding.[20] In *this* appeal, both applications of collateral estoppel are at issue.[21]

## ARGUMENT AND AUTHORITIES

### ISSUE NUMBER ONE (*Re-stated*)

**Appellant Acuna's acquittal on the murder charge in Cause number CR-2710-10-H bars a subsequent trial on a charge of conspiracy to commit the same murder.**

### ISSUE NUMBER TWO (*Re-stated*)

**The trial court erred in denying defendant's motion to dismiss indictment on double jeopardy grounds.**

### ISSUE NUMBER THREE (*Re-stated*)

**The doctrine of collateral estoppel bars the re-introduction of evidence previously admitted against Appellant Acuna where Appellant Acuna was acquitted of the same murder.**

Appellant Acuna respectfully asks this Court to consider Issues 1, 2 and 3 together. Appellant Acuna submits the following Argument and Authorities in support of her argument for all three.

The Double Jeopardy Clause protects a defendant

---

[20] *See i.e. United States v. Deerman,* 837 F.2d 684, 690 (5th Cir. 1988)

[21] The Double Jeopardy Clause bars a second prosecution for the same offense once jeopardy attaches. *Ex Parte Lange,* 85 U.S. 163, 168-169 (1873). Since the case in Cause No. CR-2725-10-H was actually litigated to a verdict of acquittal, jeopardy attached. *Crist v. Bretz,* 437 U.S. 28,29 (1978).

from the risk of being punished twice for the same offense.[22] In this case the jury found Appellant Acuna guilty based entirely on the conduct for which she was already tried and acquitted.[23] In the Application paragraph of the Jury Charge from the first trial, the jury was instructed:

> Now, if you find from the evidence beyond a reasonable doubt that on or about JULY 3, 2010, in Hidalgo County, Texas, Juan Manuel Salazar or Antonio DeLeon, did then and there intentionally or knowingly cause the death of an individual, namely, Jose Guadalupe Fiscal, by stabbing him with a deadly weapon, to wit: a knife, and that the Defendant, GUADALUPE DE LEON ACUNA, acted with intent to promote or assist the commission of the offense by Juan Manuel Salazar or Antonio DeLeon by encouraging, directing, aiding, or attempting to aid Juan Manuel Salazar or Antonio DeLeon to commit

---

[22] *Abney v. U.S.*, 431 U.S. 651, 660-62 (1977).

[23] 2CR@199, 341, 345; The facts, evidence and theory of prosecution of the instant for Conspiracy to Commit Murder are the same facts, evidence and theory used by the prosecution in the first trial. The first jury was instructed to consider the principles of the Law of Parties and in doing so found in Appellant Acuna's favor as evidenced by their verdict of not guilty. 1CR@195-196, 206

the offense of MURDER, *by asking Jose Guadalupe Fiscal to drive to the crime scene,*[24] *or by texting Juan Manuel Salazar to give notice that she and Jose Guadalupe Fiscal were on their way to the crime scene,*[25] *or by texting Antonio DeLeon that she wanted Jose Guadalupe Fiscal six feet under, or by texting Antonio DeLeon that she wanted Jose Guadalupe Fiscal down so so bad, or by asking Juan Manuel Salazar or Antonio DeLeon to kill Jose Guadalupe Fiscal,*[26] then you will find the Defendant "Guilty" of the offense of MURDER as charged in the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the Defendant and say by your verdict, "Not

---

[24] The first jury was asked to find that Appellant Acuna "asked" the victim to drive to the crime scene, whereas the second jury was asked to find that Appellant Acuna "lured Jose Guadalupe Fiscal to the location where he was killed." 1CR@196; 2CR@82

[25] Note in the first trial, the jury was asked to find that Appellant Acuna "*gave notice*" to Juan Manuel Salazar that she and the victim were on the way to the crime scene, whereas the second jury charge was asked to find beyond a reasonable doubt that Appellant Acuna "notified" Juan Manuel Salazar that she and the victim were traveling to the location where he was to be killed." 1CR@196; 2CR@82-83

[26] Note in the first trial, the jury was asked to find that Appellant Acuna "*asked*" Juan Manuel Salazar or Antonio DeLeon to kill the victim, whereas the second jury was asked to find beyond a reasonable doubt that Appellant Acuna "dircetd or told" Juan Manuel Salazar or Antonio DeLeon to kill the victim." 1CR@196; 2CR@83

Guilty."[27]

Reviewing the indictment in the *instant* case, Appellant Acuna is charged with "*conspiracy*" where specifically, she's indicted for having an intent that a murder be committed and entering into an *agreement* with Antonio DeLeon and Juan Manuel Salazar that they commit the murder. The State's theory in this case was Appellant Acuna's "overt acts" in furtherance of the conspiracy were that 1) she lured Jose Guadalupe Fiscal to the location where he was killed; 2) that she notified Salazar that she and the victim were on the way to the location where the victim was to be killed; 3) that she directed or told Juan Manuel Salazar to kill Fiscal; 4) that she directed or told Antonio DeLeon to kill Fiscal.[28]

As stated by the United States Supreme Court in <u>*Ashe v. Swenson*</u>:

"*In more recent times with the advent of specificity in draftsmanship and the extraordinary*

---

[27] 1CR@195, 196, 200; 2CR@82-83, 87
[28] 2CR@3-4; *See also* 1CR@196 (*the jury charge from the first trial where the jury was instructed to consider these exact ultimate facts.*)

*proliferation of overlapping and related statutory offenses, it became possible for prosecutors to spin out a startling numerous series of offenses from a single alleged criminal transaction.*"[29]

Based on the facts and the law, Appellant Acuna prays this Court find that the State of Texas by and through its District Attorney of Hidalgo County should have been barred from trying Appellant for the offense of "Conspiracy to Commit Murder" after her acquittal for the offense of the same Murder. Accordingly, Appellant Acuna avers this case should result in a judgment of acquittal as it violated Appellant Acuna's rights against double jeopardy, collateral estoppel and issue preclusion.

"Cases involving the arcane principles of double jeopardy and collateral estoppel are not susceptible of bright-letter law or black-letter law; these areas are most often gray, and dimly to be seen. Needless to say, one entering this field

---

[29] 397 U.S. 436, 445 n. 10 (1970)

must do so with trepidation."[30]

## A. *Collateral Estoppel in Criminal Cases*

The Supreme Court first applied "collateral estoppel" to a criminal proceeding in *United States v. Oppenheimer*.[31] The claim there was not based on a prior acquittal, but rather on a pre-trial legal ruling favorable to the defendant.[32] Subsequently, in *United States v. Adams*[33] and *Sealfon v. United States*,[34] the Court recognized that collateral estoppel *could* apply

---

[30] *United States v. Larkin*, 605 F.2d 1360, 1361 (5th Cir. 1979), cert. denied, 446 U.S. 939 (1980)

[31] 242 U.S.85 (1916)

[32] *Id*. at 86 The defendant in *Oppenheimer* obtained a ruling that his prosecution for violating the Federal Bankruptcy Act was barred by the Act's statute of limitations. After the statute of limitations ruling was held to be wrong in an *unrelated* case, the government again filed charges against the defendant. In response, the defendant invoked the prior determination that his prosecution was barred by the statute of limitations as a defense to the subsequent prosecution. The Court explained that because the defendant had never been in "jeopardy" on the charges, the double jeopardy clause did not protect him from the subsequent prosecution. *Id* at 87. At any rate, the Court stated that "it cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt." While the Court ultimately held that the second prosecution was barred, it did not base its decision on constitutional considerations. Rather, the Court based its decision on the notion that "a plea of the statute of limitations is a plea to the merits" (*citation omitted*), and stated:
> The safeguard provided by the Constitution against the gravest abuses has tended to give the impression that when it did not apply in terms, there was no other principle that could. But the fifth amendment was not intended to do away with what in the civil law is a fundamental principle of justice (*citation omitted*), in order, when a man once has been acquitted on the merits, to enable the government to prosecute him a second time. *Id* at 88

[33] 281 U.S. 202 (1930)

[34] 332 U.S. 575 (1948)

to bar prosecution after acquittal on related charges. In *Adams*, the Court held that the collateral estoppel doctrine did not bar the second prosecution because the acquittal was ambiguous.[35] In *Sealfon*, the Court held that the defendant's acquittal on conspiracy charges barred prosecution for aiding and abetting his alleged co-conspirator in perpetrating the substantive offense.[36] The Court acknowledged that the two crimes were not "the same offense within the meaning of the double jeopardy clause," so basic double jeopardy protection did not prevent the defendant from being prosecuted and punished for both. Nevertheless, the Court barred the second prosecution on the basis of the collateral estoppel doctrine.[37]

---

[35] *Adams*, 281 U.S. at 204. The defendant was being prosecuted for making a false entry in a report on the defendant's bank. *Id*. at 203. The Court found that the defendant's prior acquittal on false entry charges relating to conduct that had occurred earlier in the course of the same allegedly fraudulent transaction was not broad enough to foreclose the later prosecution. *Id*. at 205. The Court concluded that the acquittal could reflect the jury's determination that, although the entries were false, the defendant believed them to be true or justified. *Id*. The Court also concluded that, despite such a determination by the acquitting jury, another jury could conclude that the defendant had "acquired more accurate knowledge" before he made the later report, which was the subject of the second prosecution. *Id*.

[36] *Sealfon*, 332 @580
[37] *Id*. at 578-80. The defendant in *Sealfon* had concededly written a letter which furthered the goals of the alleged conspiracy. *Id*. at 576. The Court noted that acquittal on the conspiracy charges could only reflect a decision

None of the early collateral estoppel decisions were decided on constitutional grounds.[38] Because the Court had previously applied the double jeopardy clause only to protect against re-prosecution for the same offense, and the courts had not yet construed "*same offense*" broadly enough, commentators noted the need to supplement double jeopardy protection.[39]

The Supreme Court provided that additional

---

that the defendant "did not do so pursuant to an agreement with [the alleged coconspirator] Greenberg to defraud." *Id*. at 580. Yet, the government's only theory in the second trial was that the defendant had written the letter pursuant to an agreement with Greenberg and had thereby aided and abetted him to defraud the government. The Court therefore held that once the first jury had refused to find such an agreement, collateral estoppel barred the government from a second attempt to establish an agreement between the defendant and Greenberg. With no alternate theory on which to proceed, the government was barred from conducting the second prosecution.

[38] *See* Hoag v. New Jersey, 356 U.S. 464 (1958) *overruled by* Ashe v. Swenson, 397 U.S. 436 (1970). In *Hoag* the Court rejected a claim for constitutional protection. The Court approached the question as one of fundamental fairness. The Court stated "[d]espite its wide employment, we entertain grave doubts whether collateral estoppel can be regarded as a constitutional requirement. Certainly this Court has never so held." *Id*. at 471. *See also* W. LAFAVE & J. ISRAEL, CRIMINAL PROCEDURE § 17.4 (1985)

[39] *See e.g*., Lugar, *Criminal Law, Double Jeopardy and Res Judicata*, 39 IOWA L. REV. 317 (1954) (discussing inadequacy of "same transaction" test); Mayers & Yarbrough, *Bis Vexari: New Trials and Successive Prosecutions*, 74 HARV. L. REV. 1 (1960) (discussing problems with defining offense) [hereinafter Mayers]; Comment, *Twice in Jeopardy*, 75 YALE L.J. 262 (1965) (discussing problems in determining what constitutes "same offense"); *see also* Note, *The Double Jeopardy Clause as a Bar to Reintroducing Evidence*, 89 YALE L.J. 962 (1980) (discussing the inadequacy of the "same offense" test and collateral estoppel).

protection in *Ashe v. Swenson*.[40] In *Ashe*, the Supreme Court held collateral estoppel constitutes an aspect of double jeopardy protection and, therefore, is binding on the states.[41]

There, Ashe was not prosecuted twice for the "same offense" as defined by the Court, but the circumstances of his *re*-prosecution after acquittal illustrated the potential for prosecutorial abuse and circumvention of double jeopardy protection.[42]

So, the *Ashe* Court confronted the need for *additional* protection to further the overall purpose of the double jeopardy clause. In *Ashe*, six participants in a poker game were robbed by three or four masked gunmen.[43] After the robbery, the gunmen stole a car and fled.[44] Four men, one of whom was Bobby Ashe, were charged with seven separate offenses-the armed robbery of each of the six poker players and the theft of the

---

[40] 397 U.S. 436 (1970).

[41] *Id*. at 445.
[42] *Id*. at 439-40.
[43] *Id*. at 437.
[44] *Id*. The car belonged to one of the six robbery victims and was later found abandoned in a field. *Id*.

car.[45] At Ashe's first trial, the evidence established clearly the named victim, *Knight*, was indeed a victim of armed robbery and that his personal property, as well as that of the other players, was taken in the robbery.[46] The evidence connecting Ashe to the incident, however, was unconvincing because it was not clear that there had been four robbers and the three other defendants had been arrested together.[47] Further, the evidence identifying Ashe as one of the robbers was weak.[48] The jury acquitted Ashe.[49] Six weeks later, the state brought Ashe to trial for the robbery of a second participant in the same poker game. This second proceeding did not place Ashe twice in jeopardy for the "*same offense"* because each offense required proof of a fact the other did not - the identity of the robbery victim and his loss of property. Although the

---

[45] *Id*. at 438

[46] *Id*. The Court noted that the proof was "unassailable."

[47] *Id*. at 437. Three of the four defendants were arrested in the vicinity of where police had found the stolen car, whereas Ashe was arrested "some distance away" from that area. *Id*.

[48] *Id*. at 438. Two of the victims could not identify Ashe as one of the robbers, while two other victims could identify Ashe only by the sound of his voice or certain mannerisms. *Id*.

[49] *Id*. at 439.

prosecution failed to persuade the initial jury beyond a reasonable doubt that Ashe was one of the robbers, traditional double jeopardy protection as contemplated at that time would not shield him from the successive prosecutions. The state was thus afforded six additional opportunities to prove that Ashe had participated in the robbery. At the second trial, the State presented more convincing evidence that Ashe had been one of the robbers.[50] As a result of this stronger presentation, the second jury convicted Ashe for his participation in the robbery.[51]

As will by discussed further below, Appellant Acuna urges this Court to recognize the similarity here. In this case, the State presented a wealth of testimony and evidence in the first trial. However, that first jury found in favor of Appellant Acuna and acquitted her. The State then was afforded the opportunity to "refine" their case and *re*-present the testimony and

---

[50] *Id*. at 439-40. The two victims who were unable to identify Ashe as one of the robbers in the first trial were able in the second trial to identify him through his physical features and mannerisms. *Id*. at 440. Moreover, one of the witnesses who had not been helpful to the prosecution's case in the first trial was not called to testify in the re-prosecution. *Id*.

[51] *Id*. Ashe was sentenced to 35 years in the Missouri State Penitentiary. The Missouri Supreme Court affirmed the conviction. *Id*.

evidence. The State was afforded to a "do-over" since the first trial revealed its weaknesses. The State, while presenting the same case, presented it differently after seeing what worked and what didn't work the first time around.

Ultimately, the Supreme Court in Ashe held the conviction could not stand.[52] holding specifically the initial acquittal resolved the issue of whether Ashe was one of the robbers and resolved it in Ashe's favor.[53] The doctrine of collateral estoppel therefore precluded the prosecution from *re*-litigating the question of Ashe's identity as one of the robbers in the second trial.[54] Since proof of identity was essential to the second prosecution, and was therefore an "issue of ultimate fact," Ashe could not be convicted unless the prosecution could *re*-litigate that issue. As a result, the collateral estoppel doctrine shielded him from further prosecution for his alleged

---

[52] *Id*. at 445
[53] *Id*. at 446.
[54] *Id.*

involvement in the criminal episode.[55]

Similarly, in the instant case, the first jury considered the ultimate fact of whether Appellant Acuna, Juan Manuel Salazar and Antonio DeLeon "conspired" or "agreed" that Fiscal be killed. The record on appeal is clear that the State's theory in the first trial was one of conspiracy. Although they didn't call it "conspiracy,"[56] the State's theory was that Appellant Acuna wanted Fiscal dead; that Appellant Acuna directed or "orchestrated" the murder; that Appellant Acuna "called upon DeLeon and Salazar to commit the murder for her; that Appellant Acuna performed these "overt acts" in furtherance of her orchestration. Argument regarding *these* assertions are set out more specifically below.[57]

The *Ashe* Court acknowledged the difficulty in determining the issues resolved by a general verdict of "not guilty" and called on earlier decisions applying

---

[55] *Id.*
[56] Note that Appellant Acuna was originally charged with "conspiracy" to commit murder in Count Two of the first indictment – CR-2725-10-H. This Count was dismissed by the State. 1CR204
[57] 1CR@8, 196; 2CR@8

the collateral estoppel doctrine in federal criminal cases for guidance:

"The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hyper-technical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.[58]

The Court further stated:

"any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at

---

[58] *Id*. at 444

least in every case where the first judgment was based upon a general verdict of acquittal."[59]

Because neither the fact that a robbery had occurred nor the identity of the victims was open to question, the Court easily concluded that the first trial had settled the question of whether Ashe had been one of the robbers.[60] Again, here, given the first jury's "general verdict" after having been instructed to consider the language in the jury charge, any agreement or "conspiracy" between Appellant Acuna, Juan Salazar and Antonio DeLeon to commit this murder was no longer open to question.[61] This "ultimate fact" was settled by the first jury.

Further, the *Ashe* Court addressed the relationship of the collateral estoppel doctrine to the Fifth Amendment guarantee against double jeopardy. Noting the potential for "unfair and abusive" *re*-prosecutions presented by the excess number of overlapping statutory offenses and the resultant utilization of the

---

[59] *Id.*
[60] *Id.* at 446
[61] 1CR@3, 196, 200; 2CR@8;

collateral estoppel doctrine as a federal rule of law to curb these abuses,[62] the _Ashe_ Court concluded collateral estoppel was indeed among the protections afforded by the Fifth Amendment.[63]

Since its decision in _Ashe_, the Supreme Court has declined several invitations to limit the collateral estoppel protection afforded criminal defendants.[64] On other fronts, however, the Supreme Court has refused to extend the protection and has even restricted it somewhat.[65] In _Standefer v. United States_,[66] for example, the Court refused to apply collateral estoppel to bar prosecution of an alleged aider and abettor merely because the alleged principal had been acquitted.[67] The Court has also limited the extent of protection

---

[62] _Id_. at 445-46 n.10.
[63] _Id_. at 445.

[64] _See, e.g._, _Turner v. Arkansas_, 407 U.S. 366 (1972) (acquittal bars re-prosecution even though offenses could not have been tried jointly under state law); _Harris v. Washington_, 404 U.S. 55 (1971) (acquittal bars re-prosecution even though acquitting jury did not hear all the relevant evidence); _Simpson v. Florida_, 403 U.S. 384 (1971) (acquittal absolutely bars re-prosecution even though it was preceded by a conviction).
[65] Appellant Acuna avers that neither of these "limitations" apply in the instant case, but for a more complete discussion of the doctrine of collateral estoppel, points them out.
[66] 447 U.S. 10 (1980)
[67] _Id_. at 25-26. For a discussion of _Standefer_, see Case Comment, _The Use of Nonmutual Collateral Estoppel by Criminal Defendants_: _United States v. Standefer_, 93 HARV. L. REV. 804 (1980)

afforded by the collateral estoppel doctrine in civil cases.[68] An issue may be re-litigated in a civil proceeding after acquittal on criminal charges as long as the goal is remedial rather than punitive. Thus, despite the counter-vailing interest in enforcing the criminal laws, the Court has applied collateral estoppel strictly in criminal cases *to give the defendant the benefit of an acquittal.*[69] The Court relaxes the protection only when defendants seek a benefit of someone else's acquittal and when the doctrine has been invoked in civil cases.

The Supreme Court has not recently addressed the use of collateral estoppel regarding use of the doctrine to restrict the prosecution's evidence/theory. Some courts permit this use.[70] Many courts hold the

---

[68] *See, e.g.*, *United States v. One Assortment of 89 Firearms*, 465 U.S. 354 (1984) (acquittal on criminal charges involving firearms not preclusive of subsequent *in rem* proceeding against firearms)

[69] 1CR@200

[70] *See, e.g.*, *United States v. Gornto*, 792 F.2d 1028 (11th Cir. 1986); *United States v. Johnson*, 697 F.2d 735 (6th Cir. 1983), *cert. denied sub nom.* Hicks v. Unied States, 108 S.Ct. 95 (1987); United States v. Mespoulede, 597 F.2d 329 (2d Cir. 1979); United States v. Day, 591 F.2d 861 (D.C. Cir. 1978); Wingate v. Wainwright, 464 F.2d 209 (5th Cir. 1972); Riley v. State, 181 Ga. App. 667, 353 S.E.2d 598 (1987); *see also* United States v. Keller, 624 F.2d 1154 (3d Cir. 1980) (discussing the question and restating that circuit's position that the evidence is barred by non-constitutional doctrine of collateral estoppel which prohibits re-litigation of decided facts); Vestal, *Issue Preclusion and Criminal Prosecutions*, 65 IOWA L. REV. 281 (1980)

doctrine is limited to those cases where an ultimate fact was resolved in the defendant's favor in a prior proceeding.[71] The Supreme Court ultimately agrees. In _Yates v. United States_,[72] over a decade before its decision in _Ashe_, the Supreme Court stated: "The normal rule is a prior judgment need be given no conclusive effect at all unless it establishes one of the ultimate facts in issue in the subsequent proceeding. So far as merely evidentiary or 'mediate' facts are concerned, the doctrine of collateral estoppel is inoperative."[73] If Courts limit the doctrine in this manner, the

---

(courts more willing to use preclusion doctrine to foreclose repetitive litigation); Note, _Evidentiary Use of Prior Acquitted Crimes: The "Relative Burdens of Proof" Rationale_, 64 WASH. U.L.Q. 189 (1986) (suggests that courts should exclude evidence from prior acquitted crimes only if it is necessary to prove same ultimate fact); _but see_ United States v. Gentile, 816 F.2d 1157 (7th Cir. 1987) (acquittal on charge of interstate commerce violation not preclusive of use of same testimony on retrial to prove charge of cocaine possession).

[71] _See, e.g._, _Flittie v. Solem_, 775 F.2d 933 (8th Cir. 1985), _cert. denied_, 475 U.S. 1025 (1986); _United States v. Sutton_, 732 F.2d 1483 (10th Cir. 1984); _United States v. Van Cleave_, 599 F.2d 954 (10th Cir. 1979); _see also_ _People v. Goodman_, 69 N.Y. 2d 32, 36-44, 503 N.E.2d 996, 999-1003, 511 N.Y.S.2d 565, 568-72 (1986) (declining to adopt the "evidentiary fact rule" in that case); E. IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE § 10.06 at 12 (1984) ("The majority view is that the collateral estoppel doctrine does not apply to the subsequent use of evidence of the act as uncharged misconduct."); Note, _Collateral Estoppel Effect of Prior Acquittals_: United States v. Mespoulede, 46 BROOKLYN L. REV. 781 (1980) (advocating that collateral estoppel be limited to ultimate facts); Note, _Perjury by Defendants: the Uses of Double Jeopardy and Collateral Estoppel_, 74 HARV. L. REV. 752, 758-59 (1961) (discussing various approaches used by courts in applying collateral estoppel in criminal cases); Note, _supra_ note 39.

[72] 354 U.S. 298 (1957).

[73] _Id_. at 338 (_citing_ The Evergreens v. Nunan, 141 F.2d 927 (2d Cir. 1944)) (other citations omitted), _cert. denied_, 323 U.S. 720 (1944)).

---

doctrine will never act to bar evidence. The harm against which collateral estoppel protects cannot be prevented if the protection applies only when the fact determined in the first trial is also an ultimate fact in the second trial. Appellant Acuna advocates the broader construction of collateral estoppel discussed hereinbelow.

## B. Double Jeopardy Protection: "Same Offense" and Re-use of Evidence

Collateral estoppel is not the principal constitutional protection against *re*-prosecution. Double jeopardy bars *re*-prosecution for the same offense.[74] Double jeopardy applies equally whether the initial prosecution ended in conviction or acquittal.[75] Collateral estoppel therefore must be viewed against the backdrop of basic double jeopardy protection.[76]

The role that re-use of evidence, as opposed to overlap of statutory elements, plays in defining the "same offense" for purposes of double jeopardy is

---

[74] *See Brown v. Ohio*, 432 U.S. 161 (1977); *Green v. United States*, 355 U.S. 184, 187-88 (1957)
[75] *Brown*, 432 U.S. 161, 165; LAFAVE, *supra* note 11, § 24.1
[76] 2CR@199, 341, 345

unclear. The Supreme Court defined "same offense" in *Block-burger v. United States*[77] and has never departed from that basic definition. "Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not."[78] In most cases, comparing the statutory elements will determine whether the offenses are the same under the *Blockburger* test.[79] Thus, the *Blockburger* definition of the "same offense," renders the role of the evidence in the successive trials insignificant to that determination.[80]

However, the Supreme Court's decision in *Illinois v. Vitale* suggests a broader definition of the "same

---

[77] 284 U.S. 299 (1932)

[78] *Id*. at 304 (citations omitted).

[79] *See, e.g.*, *Flittie v. Solem*, 775 F.2d 933, 937 (8th Cir. 1985), *cert. denied*, 475 U.S. 1025 (1986). *See generally* Thomas, *The Prohibition of Successive Prosecutions for the Same Offense: In Search of a Definition*, 71 IOWA L. REV. 323 (1986)(general review and analysis of tests applied by various courts); Comment, *supra* note 12.

[80] *See Iannelli v. United States*, 420 U.S. 770 (1975), *overruled by Brown v. Ohio*, 432 U.S. 161 (1977); *United States v. Levy,* 803 F.2d 1390, 1397 (5th Cir. 1986); Note, *supra* note 12. In *Iannelli* the Court noted that "the test focuses on the statutory elements of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *Iannelli*, 420 U.S. at 785 n.17.

offense."[81] Under *that* definition, two offenses which have no overlapping elements *could* be the same offense for double jeopardy purposes *if the prosecution relied on the same evidence or theory in both*. Prosecution of the second offense would be barred by the core of double jeopardy because reliance on the same evidence would make it the "same offense." Adopting this definition of the "same offense" will operate regardless of whether the first verdict is an acquittal or a conviction; it will operate independently of collateral estoppel protection and will eliminate the need for collateral estoppel protection in some cases.

In *Vitale* the Court confronted a claim of double jeopardy protection where two offenses did not have overlapping elements; the prosecution was likely to rely on the same theory in the second proceeding.[82]

---

[81] 447 U.S. 410 (1980); *See* Eisenberg, *Multiple Punishments for the "Same Offense" in Illinois*, 11 S. ILL. U.L.J. 217, 244-46 (1987); Thomas, *supra* note 47, at 382-88.

[82] *Vitale*, 447 U.S. at 418. The second proceeding had not yet occurred because of the litigation concerning the defendant's double jeopardy claim, therefore the prosecution had never had to commit itself to a theory of prosecution or introduce evidence to support its claim. Nevertheless, as the dissenting

*Vitale* was convicted of failing to slow his automobile at the time of a fatal accident. The state prosecuted him for involuntary manslaughter, and Vitale claimed the double jeopardy clause barred further prosecution.[83] The statutory elements were not the same, but Vitale argued the prosecution intended to establish manslaughter by demonstrating he failed to slow. The Supreme Court discussed, without entirely settling, whether double jeopardy protection bars prosecution for an offense that has different statutory elements but will be established in part by proving all the elements of an offense of which the defendant has already been convicted and for which he has been punished. Because the first prosecution led to conviction rather than acquittal, the question of collateral estoppel did not arise.[84] Vitale contended the offenses were the same for purposes of double jeopardy. However, comparing the

---

justices pointed out, throughout the lengthy process of litigating the double jeopardy claim, the prosecution had never suggested that it had any other theory on which to pursue the manslaughter charge. *Id*. at 423 (Stevens, J., dissenting).

[83] *Id*. at 413; *Id*. at 416-19.

[84] *Id*. at 418-19.

*statutory elements* of the two crimes did not establish that they were the same offense.[85] The resolution of Vitale's double jeopardy argument turned on his prediction that the prosecution would rely on his "failure to slow" to establish an essential element of the manslaughter offense. The Court's majority stated if the prosecution could establish the manslaughter offense *only* by proving Vitale's "failure to slow," the defendant's claim that the second prosecution violated his double jeopardy protection "would be substantial."[86] Similarly, in the instant case, the first jury settled the issue of whether Appellant Acuna, Juan Salazar and Antonio DeLeon acted together pursuant to an agreement to kill Fiscal.[87] Yet, the State's only theory presented at the second trial was that in fact Appellant Acuna, Juan Salazar and Antonio DeLeon acted together pursuant to an agreement to kill Fiscal.

*Vitale* thus suggests if elements of an offense

---

[85] *Vitale*, 447 U.S. at 418; In a given case the prosecution could establish manslaughter by automobile without establishing failure to slow. *Id*. at 416-419.

[86] *Id*.

[87] 1CR@196, 200

already disposed of would be proven as ultimate facts in the subsequent prosecution, the two are the "same offense" and further prosecution and punishment is foreclosed.[88]

## C. Collateral Estoppel and Double Jeopardy - Preventing Re-use of Evidence

If the first proceeding ends in acquittal collateral estoppel comes into play as well as basic double jeopardy protection.[89] *United States v. Kills Plenty*[90] illustrates a situation in which either collateral estoppel or the conclusion that the two crimes were the "same offense" would have barred the second prosecution if brought by the same sovereign.[91]

---

[88] *See generally Flittie v. Solem*, 775 F.2d 933 (8th Cir. 1985), *cert. denied*, 475 U.S. 1025 (1986); Eisenberg, *supra* note 50, at 244-46; Thomas, *supra* note 47, at 382-88.

[89] *See Green v. Ohio*, 455 U.S. 976, 980-81 (1982) (White, J., dissenting) (in order denying certiorari dissent described collateral estoppel as an "independent safeguard"); *Ashe v. Swenson*, 397 U.S. 436 (1970); *United States v. Williams*, 341 U.S. 58, 64 n.64 (1951); *Flittie*, 775 F.2d 933; *United States v. Castro*, 629 F.2d 456, 464-65 (7th Cir. 1980) (collateral estoppel does not bar re-prosecution after a conviction; it only operates after acquittal); LAFAVE, *supra* note 11, § 17.4

[90] 466 F.2d 240 (8th Cir. 1972), *cert. denied*, 410 U.S. 916 (1973)

[91] At the time *Kills Plenty* was decided, it was unclear whether double jeopardy operated to preclude federal prosecution after prosecution by tribal authorities. In *Kills Plenty* the court did not resolve that issue, holding instead that double jeopardy protection would not foreclose the second prosecution because it was not the same offense as the first and collateral estoppel did not operate. *Kills Plenty*, 466 F.2d at 243. The Supreme Court has since decided that tribal authorities are a separate sovereign from the state and federal authorities. *See United States v. Wheeler*, 435 U.S. 313,

In *Kills Plenty* the defendant was tried and acquitted in tribal court on a charge of driving while under the influence of intoxicating liquor.[92] He was *then* charged in federal court with involuntary manslaughter.[93] The second jury was given the option of convicting on the *same theory* and *same evidence* rejected in the first proceeding. To establish involuntary manslaughter the second prosecution had to prove the defendant killed the victim without malice and "that such killing was done in the commission of a lawful act which might produce death and that such act was done either in an unlawful manner or without due caution or circumspection."[94] In the first trial, the question of whether the defendant was intoxicated at the time of the accident was resolved in *his* favor, providing a

---

328 (1978). Therefore, double jeopardy protection would not actually operate on the facts of the case. This gap in protection illustrates an important limitation of double jeopardy protection. It operates only when both prosecutions are brought by the same sovereign authority and, therefore, has no impact on successive prosecutions by different states or by state and federal authorities. *See Heath v. Alabama*, 474 U.S. 82 (1985); *Abbate v. United States*, 359 U.S. 187 (1959); *Bartkus v. Illinois*, 359 U.S. 121 (1959); *United States v. Addington*, 471 F.2d 560, 566 (10th Cir. 1973).

[92] *Kills Plenty*, 466 F.2d at 241.

[93] *Id*. at 241-42.

[94] *Id*. at 242.

basis on which he could invoke collateral estoppel.[95] However, intoxication was not necessarily essential to conviction in the second proceeding; the prosecution could *potentially* establish involuntary manslaughter without proving intoxication. Therefore, the narrowest application of collateral estoppel, to bar prosecution by precluding re-litigation of issues of ultimate fact, did not help the defendant. At the manslaughter trial, the *Kills Plenty* court admitted evidence showing defendant was intoxicated at the time of the fatal collision and instructed the jury "that it is unlawful to operate a motor vehicle upon a public highway while in a state of intoxication."[96] Thus, although the jurors might have based their guilty verdict on an unlawful act different from that rejected in the first proceeding, they might equally have convicted because they were convinced beyond a reasonable doubt that the defendant had killed the victim while committing the unlawful act of driving while intoxicated. The evidence

---

[95] *Id*

[96] *Id*. at 242.

and the jury instructions permitted, *even invited*, that latter resolution of the case. The double jeopardy clause should protect against the possibility the prosecution will obtain a conviction by re-litigating an issue previously resolved in the defendant's favor – an acquittal.

Like *Vitale*, the defendant in *Kills Plenty* could have prevailed had he persuaded the court the second charge was the "same offense" as the first. The second charge in *Kills Plenty* could be viewed as the "same offense" under the double jeopardy clause because the prosecution relied on proof of intoxication. Under that view, basic double jeopardy protection would bar the second prosecution. In *Kills Plenty*, however, this was merely an alternative argument. Because the initial trial led to an acquittal, collateral estoppel would also protect the defendant against further prosecution on the basis of the same evidence and theory.

Acquittal on the substantive charge does not necessarily preclude or limit prosecution on the

conspiracy charges *unless* collateral estoppel comes into play. In such cases, therefore, protection will not flow from basic double jeopardy protection. The defendant will be protected by the doctrine of collateral estoppel or not at all. Therefore, the protection of the Collateral Estoppel doctrine must be expanded to exclude evidentiary facts.[97]

## II. EXTENDING COLLATERAL ESTOPPEL TO EXCLUDE EVIDENTIARY FACTS

If an issue resolved in the defendant's favor by an acquittal is essential to the second prosecution, the entire prosecution is foreclosed on grounds of collateral estoppel, as it was in *Ashe*.[98] In such a case, a verdict could be achieved only by *re*-litigating the previously resolved issue using the same facts, evidence and prosecution theory.[99]

### A. The Purpose of Collateral Estoppel

Assessing whether and how collateral estoppel operates to preclude re-use of evidence after acquittal

---

[97] 2CR@199
[98] *Ashe*, 397 U.S. at 446.
[99] 2CR@199, 345

must focus on the purpose of collateral estoppel. In *Ashe*, the Court did not speak at length to the *purpose* of the doctrine. The Court merely stated: "Whatever else double jeopardy may embrace ... it surely protects a man who has been acquitted from having to 'run the gantlet' a second time."[100] A clearer sense of the role and function of the protection must incorporate decisions dealing with other aspects of the double jeopardy clause and reasons why collateral estoppel is constitutionally mandated.

"A primary purpose served by the double jeopardy clause is akin to that served by doctrines of *res judicata* and collateral estoppel - to preserve the finality of judgments."[101] In a frequently quoted passage from *Green v. United States*,[102] the Supreme Court explained the reasons for providing that protection to the criminal defendant:

> The State with all its resources and power
> should not be allowed to make repeated

---

[100] *Id.* (*citing Green v. United States*, 355 U.S. 184, 190 (1957)).
[101] *Crist v. Bretz*, 437 U.S. 28, 33 (1978)
[102] 355 U.S. 184 (1957).

attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.[103]

Although there are situations where a defendant, having once been put in jeopardy, may be tried again,[104] the Supreme Court insists on unflagging double jeopardy protection when the first proceeding ends in acquittal. After conviction, a defendant is protected only from further prosecution and punishment for the same offense. When double jeopardy is invoked by a defendant who has been in jeopardy and has *not* won an acquittal, the Court will balance the defendant's double jeopardy interest against the public interest in enforcing criminal laws to determine the extent of the

---

[103] *Id*. at 187-88.
[104] LAFAVE, *supra* note 11, § 24.4.

protection.[105]

But an acquittal occupies a particularly exalted position in our system of criminal justice and commands the greatest double jeopardy protection.[106] After acquittal, the constitution not only prohibits further proceedings on the same offense, but also, through the doctrine of collateral estoppel, prohibits *re-litigation* of individual issues resolved in the defendant's favor by the acquittal.[107] The protection flowing from an acquittal is absolute; it's not subject to compromise through application of balancing tests.[108] Even a clearly erroneous acquittal is allowed to stand as an absolute bar to further prosecution.[109]

It's clear once a defendant wins an acquittal,

---

[105] *See Illinois v. Somerville*, 410 U.S. 458, 463 (1973). *See generally* Westen & Drubel, *Toward a General Theory of Double Jeopardy*, 1978 SUP. CT. REV. 81 (1979) [*hereinafter Westen*].

[106] *See generally Westen*, *supra* note 83; *See Sanabria v. United States*, 437 U.S. 54, 64 (1978); *but cf. United States v. Scott*, 437 U.S. 82, 101 (1978) (defendant seeks termination of trial without determination of guilt, government's appeal is not barred); *see also Westen*, *supra* note 83, at 84 (of three interests served by double jeopardy, the most important is the "interest in nullification," an absolute interest in allowing the jury to acquit against the evidence).

[107] 1CR@200; 2CR@199, 327, 345; *See, e.g.*, Sealfon v. United States, 332 U.S. 575 (1948)

[108] *See Sanabria*, 437 U.S. at 64; *see generally* Westen, *supra* note 83.

[109] *See Sanabria*, 437 U.S. at 64; *see generally Westen*, *supra* note 83.

additional double jeopardy concerns come into play. After acquittal, if further proceedings are allowed, the concern the prosecution will convict an innocent person by presenting the same case to a new fact finder is paramount.[110] The prosecution, having failed in its initial effort to convict a defendant cannot appeal to correct any perceived unfairness to the prosecution's interest. The prosecution therefore may have a strong incentive to seek an alternate way to achieve its goal of conviction. A key purpose of collateral estoppel is to avoid this risk.[111] Protection against harassment by successive prosecutions also comes into play in some cases where collateral estoppel is the only source of constitutional protection.[112] If a theory or evidence already found wanting by the acquitting fact finder is an important aspect of the prosecution's case, the

---

[110] 2CR@199; *See* United States v. Scott, 437 U.S. 82 (1978). In *Scott*, the Court explained why protection against further prosecution is particularly important after an acquittal: "To permit a second trial after an acquittal, however, mistaken the acquittal may have been, would present an unacceptably high risk that the government, with its vastly superior resources, might wear down the defendant so that 'even though innocent he may be found guilty." *Id*. at 91 (*quoting* Green v. United States, 355 U.S. 184, 188 (1957)). *See Thomas*, *supra* note 47, at 337-340.

[111] *See* Comment, *supra* note 12.

[112] *See* Mayers, *supra* note 12; *Vestal*, *supra* note 39

chance of conviction may not be great, but permitting the prosecution to proceed imposes on a defendant the stress, embarrassment, and expense of the second trial. *Ashe* illustrates these risks well. In *Ashe*, by using the first trial, where defendant Ashe was acquitted, as a dry run for the second, the prosecutor was able to refine and improve the evidence that was presented to the jury - precisely what the constitution forbids.[113] What's more, the prosecution was able to harass the defendant by forcing him to trial again on charges he'd fully defended. The scope of collateral estoppel protection must be defined with reference to these double jeopardy concerns and to the specially protected character of an acquittal. The protection of an acquittal is absolute.

Two concerns are most pertinent to collateral estoppel protection. First, collateral estoppel protects a defendant against the risk of conviction or

---

[113] Much the way the State was able to do in this case, where the DNA analyst testified there was no affirmative link to Appellant Acuna through her analysis of the evidence – this witness was not called to testify at the second trial; *Ashe v. Swenson*, 397 U.S. 436, 447 (1970) (Black, J., concurring).

punishment because the prosecution was able to present the case against the defendant to another fact-finder. The risk to the defendant flows both from the prosecutor's opportunity to present the evidence in a more convincing fashion, having evaluated the weaknesses in the prosecution case, and from the simple opportunity to persuade another fact-finder, who may prove more prone to convict than the first. Second, collateral estoppel protects the defendant against the harassment and accompanying emotional and financial expense of successive prosecutions.[114] The prosecution can inflict a significant, and constitutionally prohibited, burden on the defendant merely by again holding him to answer charges, even if ultimate conviction is unlikely. These two concerns should guide the courts in defining the scope of collateral estoppel and determining its role in restricting the prosecution in a criminal proceeding following an acquittal.

---

[114] Appellant Acuna retained counsel to defend her against these charges in the first trial, however was unable to retain counsel to defend her in the second trial.  Her financial resources depleted, Appellant Acuna settled for appointed counsel at the second trial and of course on appeal. 1CR@97; 2CR@110, 127, 155, 244, 247, 249, 252, 318-319

## B. The Application of Collateral Estoppel to Exclude Evidence

When the risks against which the doctrine of collateral estoppel protects are present, collateral estoppel must shield the defendant by restricting the prosecution. In some cases, reuse of evidence creates those risks. Appellant Acuna asserts the instant case is one of those cases.

*Yawn v. United States*[115] is typical of the cases raising this question and illustrates the need for a collateral estoppel doctrine broad enough to provide a remedy even if no issue of ultimate fact has been resolved in the defendant's favor. In *Yawn* the defendant was first tried and acquitted for several charges, all arising from his alleged possession of an illegal still.[116] The defendant was then tried on an indictment charging conspiracy to violate the liquor tax laws.[117] The conspiracy indictment alleged possession of the still as one overt act in furtherance

---

[115] 244 F.2d 235 (5th Cir. 1957).
[116] *Id*. at 236
[117] *Id*.

of the conspiracy.[118] The acquittal foreclosed further attempts to convict the defendant of a charge which had possession of the still as an essential element. Because the conspiracy charge could be established without proving that the defendant possessed the still, possession was not an issue of ultimate fact in the conspiracy prosecution.[119] Therefore, collateral estoppel was not a complete bar to prosecution for the conspiracy. But possession was alleged as an overt act in furtherance of the conspiracy and the evidence demonstrating the defendant's possession was presented to the second jury.[120] Consequently, the defendant's double jeopardy protection under the doctrine of collateral estoppel was threatened in two ways. First, expecting to rely on the evidence demonstrating possession, the prosecution was able to bring charges that it might otherwise not have been able to bring,[121] thus the prosecution was able to harass the defendant

---

[118] *Id.*
[119] *Id.* at 237
[120] *Id.*
[121] It is unethical for a prosecutor to bring charges without probable cause. MODEL RULES OF PROFESSIONAL CONDUCT RULE 3.8(a) **(Proposed Final Draft 1981)**.

by relying on its *re*-introduction *of the same evidence and theory in support of the conspiracy charge.* Second, the jury may have convicted the defendant of conspiracy because the jury was convinced the defendant agreed to violate the tax laws and was convinced beyond a reasonable doubt that he possessed the still in furtherance of that goal. Thus, the prosecution may have prevailed by *re*-litigating the issue resolved against it by the previous acquittal and presenting that issue to a second fact finder for resolution. The prosecution may have convinced the second fact finder to accept the proposition already rejected by the acquitting jury. Collateral estoppel should have protected Yawn by excluding the evidence, thereby eliminating that aspect of the government's conspiracy case. That remedy would defeat the case unless the prosecution had some *other* evidence against the defendant and would also ensure that the prosecution could not obtain a conviction by *re*-litigating the previously rejected proposition. The <u>*Yawn*</u> Court

stated:

> "In the present case the Government had, and has, every right to establish the guilt of the accused of the separate offense of conspiracy to violate the liquor tax laws despite the acquittal of unlawful possession of the still.[122] But to allow the Government to have a second opportunity to establish the precise fact of possession decided by another Court of competent jurisdiction in favor of the accused is to ignore the rule that ' ... *the same facts cannot be twice litigated by the same sovereign against the same defendant.*"[123]

*United States v. Mock*[124] and *United States v. Crispino*[125] illustrate other instances where collateral estoppel should provide protection even though the second proceeding does not depend on an issue of ultimate fact resolved by the acquittal. In *Mock* and *Crispino* the defendants were charged with narcotics

---

[122] *See also* *Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489.
[123] *Id*. at 237
[124] 640 F.2d 629 (5th Cir. 1981).
[125] 586 F.Supp. 1525 (D.N.J. 1984).

trafficking. After they were acquitted on the narcotics charges, the defendants were charged with tax violations. In each of the tax cases, the government relied on the theory that Mock and Crispino didn't report income derived from narcotics activity. To convict them the jury in each tax case would have to be convinced beyond a reasonable doubt of the "likely source" of the unreported income. In *Mock*, the government's main theory was that the defendant had received and failed to report income from precisely the conspiracy of which he had been acquitted; the prosecution even relied on the same witness who had implicated Mock in the conspiracy trial.[126] After Mock's conspiracy conviction was reversed and remanded, the government *re*-prosecuted him, relying on evidence that did not tend to establish the previously charged conspiracy, and obtained a conviction which withstood a

---

[126] *United States v. Mock*, 604 F.2d 341 (5th Cir. 1979) Prosecution introduced testimony of Sandra Scott, testifying about Mock's involvement with drugs at a time close to but not covered by the first charges. The court rejected the prosecution's harmless error argument and reversed and remanded. *Id*. at 346-47. The court concluded that both the extent of the duplicative testimony and the prosecution's reliance on proof of the same conspiracy made it unlikely the jury would've convicted the defendant on the basis of proof of drug activity independent of the acquitted conspiracy. *Id*. at 347.

collateral estoppel challenge.[127] In *Crispino*, the court ruled *before* trial that the government could not rely on proof of the drug conspiracy to establish the likely source of income, but refused to dismiss the indictment. The prosecution was free to introduce *other* evidence supporting its tax charges, if it had any.

In each case, the issues of ultimate fact resolved by the acquittal of conspiracy charged in the first trial were not issues of ultimate fact in the second.[128] Nevertheless, the prosecution's reliance on the theory and evidence rejected in the prior drug trials presented significant risks to the defendants' interests. The threat in each case was that the second jury would *re*-evaluate the defendant's involvement in the drug conspiracy, finding it the likely source of income and thus base the conviction on the conclusion already rejected in the initial acquittal. In *Crispino*, the court even commented that its decision was "strongly bolstered by its conclusion the government,

---

[127] *United States v. Mock*, 640 F.2d 629, 632 (1981)

[128] *United States v. Mock*, 640 F.2d 629, 632 (1981)

disappointed by the results in the first trial, simply polished and refined its evidence *from that trial* in an effort to find some way, *any* way, of convicting this defendant of criminal charges."[129] Collateral estoppel should protect a defendant against the *re*-presentation of a theory and evidence by the prosecution. If the prosecution wants to continue to pursue a defendant who has won an acquittal, collateral estoppel requires that the prosecution find a new basis on which to proceed. The prosecution should not be able to avoid that prohibition by fitting the rejected theory and evidence to new charges.

Cases like *Yawn, Mock*, and *Crispino* demonstrate the need for collateral estoppel protection to limit the scope of *re*-prosecution after acquittal even where the second prosecution does not involve the "same offense" and no issue of ultimate fact in the second case has been resolved in the defendant's favor.

## IV. Application of these principles to the instant case

---

[129] *Crispino*, 586 F.Supp. at 1535 (emphasis in original).

A. The State's Theory in Both Prosecutions[130]

In trial court cause number CR-2725-10-H, Appellant Acuna was charged by indictment as follows:

"*on or about the 3rd day of July, 2010 … did then and there intentionally and knowingly cause the death of an individual, namely Jose Guadalupe Fiscal, by stabbing him with a deadly weapon, to wit: a knife.*[131]

The Prosecution gave the following Opening Statement in that first case:

Thank you, Your Honor. May it please the Court, ladies and gentlemen of the jury, defense counsel and co-counsel? Good afternoon, ladies and gentlemen. Ladies and gentlemen, the evidence that we will present to you will show you that this defendant was responsible for the death of Jose

---

[130] Note that the prosecution admits the State needs to have proven an agreement to commit a conspiracy and overt acts in furtherance of that conspiracy. The State goes further and admits prior to the trial starting that the evidence that will be presented this second tie around is "similar." RR2@13 As discussed herein, the evidence submitted to the first jury and that submitted to the second jury is identical.

[131] Note that Count Two charging Appellant Acuna with Conspiracy to Commit Murder was dismissed. 1CR@8, 204-205

Guadalupe Fiscal.[132] The evidence will show that Mr. Fiscal was hit over the head. He was struck so violently that he was probably rendered unconscious. After which, he was stabbed multiple times. And as if that weren't enough, Mr. Fiscal's body was set on fire. Now, ladies and gentlemen, the State is not going to bring a witness to you who will tell you that this defendant personally struck that blow to the victim's head. Not one witness will come into this courtroom and tell you that she held the knife that was used to stab Jose. But what the State will prove to you beyond a reasonable doubt is that this woman is completely *responsible* for Jose Fiscal's death, that she orchestrated the entire -- the entire situation that occurred on July 3rd, 2010.[133] You'll hear

---

[132] Right off the bat in the first case, the State concedes in its opening remarks the evidence would show Appellant Acuna was "*responsible*" for the death of the victim. This first jury is told they would not hear evidence Appellant Acuna committed the murder herself. The jury was later instructed they were to convict if they believed Appellant Acuna was "*criminally responsible*" for the death if she acted with intent that the offense occur and aided, assisted or directed another in the commission of the offense. 1CR@196; TEX.PEN.CODE Section 7.02

[133] Here, the State's theory becomes clear: that Appellant Acuna was the one directing the killing – that she "*orchestrated it.*" This becomes even clearer when the indictment of the second trial is reviewed to reveal the

evidence that Jose and Alma Fiscal began dating years ago. Eventually they married and they raised four children, and you'll hear testimony that there were good times and there were bad times just as any marriage. Eventually the bad times outnumbered the good times and Jose and Alma went their separate ways. Alma moved to the state of Louisiana where she worked in a refinery and Jose stayed behind in the Valley where he worked in a cabinetry business with his family. And you'll hear testimony that their children were a priority between the two of them, that Alma would come down. She would bring her children. Jose will spend time with his children. During the summer he spent time with them. You'll hear testimony that he also shared time with another individual, and that's the defendant who sits before you today, Guadalupe Acuna, also known as Lupita. And you'll hear evidence -- testimony that Jose spent a great deal

State charged Appellant Acuna with Conspiracy to Commit Murder alleging the exact same "overt acts" alleged to have committed by her in the application paragraph of the first jury charge.

of time with Lupita.  Lupita lived in a home in Donna and she's raising five children.  She had a daughter by the name of -- or has a daughter by the name of Alejandra, a son by the name of Antonio, another daughter named Maria and two smaller children and Jose spent time with Lupita and the children.  You'll also hear testimony that she had a brother-in-law by the name of Juan Manuel Salazar who also stayed at her house off and on. But, ladies and gentlemen, Jose came to a point in his life when he realized who the person was that he wanted to wake up in bed next to every morning. And that's when the problems arose because Lupita wasn't that person.  She wasn't that woman.  It was Alma.  And Jose called his wife and he told her I want to make a fresh start.  I want to make this right.  And Jose purchased a home for that fresh start, and he asked her to come home. But he also told her that he needed a little bit of time because Jose knew this woman and he knew that it

wouldn't be easy to walk away from her. Now, Alma was scheduled to return to the Valley July 3rd but she needed a few days early and she walked into that home that Jose had purchased for her with that fresh start and she had an unexpected surprise because when Alma returned to that home, Lupita was there.[134] And, of course, this angered Alma and she told Jose you need to get her out of here. And that's when Jose made a very important decision. He looked at Lupita and he told her to leave but he wasn't the only person making a decision that day. Because she left but she too had made a decision. Jose Fiscal would not walk away from her. She would make sure of it, and who would she look to? She would look to the two closest men in her life -- her brother-in-law, Juan Manuel Salazar, and her own son, Antonio. She wanted Jose down. She wanted him six feet under. And you'll have an opportunity

---

[134] Although not necessary to prove, the State lays out the motive for the killing…the same motive relied upon in the second trial.

to read the text messages[135] that occurred between Lupita and her brother-in-law and her son.[136] July 3rd, 2010 was a hot, windy day. Fireworks were being sold on the side of the road. People were making plans to enjoy the holiday. Lupita was making plans too. On July 3rd, 2010 she lured Jose Fiscal to Donna Lakes. And when she was there and she was ready, she sent word to her brother-in-law and to her son and they came and they did exactly what Lupita wanted them to do.[137] You'll also see that through a statement, several statements that this defendant gave to the investigators at the sheriff's department, and she'll tell you in her own words, exactly what happened and why it happened. At the close of the evidence, the State will ask that you find this defendant guilty of

---

[135] The text messages proved to be the "cornerstone" piece of evidence used in the first trial by prosecutors to show the communication which the State relied on in showing there was collaboration between Appellant Acuna, DeLeon and Salazar.

[136] Here, during the first trial, the State shows how important the text messages were to show the communication between Appellant Acuna and the co-defendants in order to prove the "criminal responsibility."

[137] Again, the State relying on the theory that Appellant Acuna and the co-defendants collaborated to kill the victim.

murder. Thank you.[138]

The first jury rejected this theory and by way of its Verdict expressed this rejection.[139] This acquittal in Cause No. CR-2725-10-H conclusively established Appellant Acuna did not commit the substantive offense of "Murder." Note the jury charge in the first trial instructed the jury to convict if they believed beyond a reasonable doubt that she was *responsible* for the death of Fiscal under the Law of Parties.[140] In fact, the jury charge specifically instructed the jury to convict if they found Appellant Acuna acted in the identical way with which she was charged by indictment in the second case – *this case*.[141] In other words, the jury charge from the first trial actually presented the jury with an opportunity to deliberate, consider and/or "*find*" ultimate facts showing Appellant Acuna entered into an *agreement* with Juan Manuel Salazar and Antonio

---

[138] State's Opening Statement at first trial; 1RR2@98
[139] 1CR@195-200, 206
[140] 1CR@195-196
[141] 1CR@196; 2CR@8-3-4

DeLeon to kill Fiscal. [142] The jury, by their verdict of "not guilty" clearly rejected that notion and found in favor of Appellant Acuna.[143]

Five (5) months after her acquittal, Appellant Acuna was again placed in jeopardy in trial court cause number CR-4071-11-H.[144] Here, charging Appellant Acuna as follows:

On or about the 3rd day of July, 2010, with the intent that murder, a felony, be committed, agree with Juan Manuel Salazar and Antonio Rodriguez De Leon that one of them would engage in conduct that would constitute said offense, and the said defendant *performed an overt act in pursuance of said agreement, to wit: luring Jose Guadalupe Fiscal to the location where he was killed*.

---

[142] Note that the first jury was instructed on the definition of the Law of Parties. That definition included that "all persons are parties to an offense who are guilty of acting together in the commission of an offense." 1CR196; TEX.PEN.Code Section 7.02; *See Also* Wooden v. State, 101 S.W.3d542, 546 (Tex.App.-Fort Worth 2003, pet. ref'd.)(The evidence must shpw at the time of the offense the parties were acting together, each contributing some part towards their common purpose.) Obviously then whether one calls it "acting together toward a common purpose" or they call it "conspiracy," it's the same thing.

[143] 1CR@196, 200

[144] The first jury returned an acquittal on the murder charge on April 20, 2011; the indictment charging Appellant Acuna with this Conspiracy to Commit Murder was filed September 13, 2011. 1CR@200; 2CR@3-4

And………… On or about the 3rd day of July, 2010, with the intent that murder, a felony, be committed, agree with Juan Manuel Salazar and Antonio Rodriguez De Leon that one of them would engage in conduct that would constitute said offense, and the said defendant *performed an overt act in pursuance of said agreement, to wit: notifying Juan Manuel Salazar that the said defendant and Jose Guadalupe Fiscal were traveling to the location where Jose Guadalupe Fiscal was killed*.

And………… On or about the 3rd day of July, 2010, with the intent that murder, a felony, be committed, agree with Juan Manuel Salazar and Antonio Rodriguez De Leon that one of them would engage in conduct that would constitute said offense, and the said defendant *performed an overt act in pursuance of said agreement, to wit: directing or telling Juan Manuel Salazar to kill Jose Guadalupe Fiscal*.

And………… On or about the 3rd day of July, 2010, with the intent that murder, a felony, be committed,

agree with Juan Manuel Salazar and Antonio Rodriguez De Leon that one of them would engage in conduct that would constitute said offense, and the said defendant *performed an overt act in pursuance of said agreement, to wit: directing or telling Antonio Rodriguez De Leon to kill Jose Guadalupe Fiscal.*[145]

This second time around,[146] the State stated in its opening remarks:

The man that was found on that dirt road had been struck over the head. He had been stabbed 45 times, and his body had been set on fire. His name was Jose Fiscal. He was a son. He was a brother. He was a father. Now, Mr. Fiscal had met a young woman named Alma, and the two of them had a relationship when they were young. It resulted in the birth of a child, and the two of them married. They would go on to have three more children, and, as in most relationships, the evidence is going to show that

---

[145] CR@3-4
[146] CR-4071-11-H, the instant case.

there were good times and there were bad times. And, at some point, the two decided to move their separate ways. You'll hear evidence or testimony that Alma relocated to the state of Louisiana to work. And you'll hear that Jose stayed behind and worked with his family. There was visitation of the child. There was communication between the two. But Jose has entered into another relationship. And the evidence is going to show that, in fact, he entered into this relationship with the Defendant during the time that he was still with Alma. And as Alma moved away, he carried on this relationship with the Defendant. Now, the evidence will show that, at some point, Jose realized that he had made a mistake. He realized that he wanted to have his family and he wanted to be with his wife. He had made a mistake. That mistake was the Defendant. Now, Jose began to communicate with his wife, Alma, and the evidence will show that she decided to come back, to come back to the Valley, but Jose knew who

he was dealing with it. The evidence is going to show that Jose couldn't just walk away from Lupita because he knew what she was capable of doing. Now, Alma made her way back to the Valley. Jose had purchased a new home for them to share with their children. And the evidence will show that when Alma walked into that house, the Defendant was still there. Why? Because Jose hadn't gotten away from her yet because he knew who he was dealing with. He knew what she was capable of. But Jose made an important decision in that home that day. That decision would result in the loss of his life, the decision that he made that day, telling this woman to leave. He asked her to leave that house. And the evidence will show that this angered Lupita. She would make him pay for that choice. Now, Lupita lived in a home with several of her children. She had a daughter by the name of Alejandra, and Alejandra had a boyfriend who was sharing the home, named Ezekiel Gamez. The Defendant had a son living

in that home.  His name was Antonio De Leon. He had a girlfriend he would date at times named Rene Mejia. The Defendant also had her brother-in-law, Juan Manuel Salazar, who was living in that home at that time because he was estranged from her sister. The evidence will show that Lupita ran that house. She made the decisions on what was going to happen in that home. And when Jose asked her to leave his new home, she had made a decision, but she knew she wasn't capable of carrying out that decision by herself. So what did she do?  She turned to two men that she controlled, her son and her brother-in-law.  And you will hear, through her own words, text messages[147] that she shared with the two of them, a statement of accused or a confession that she gave investigators.[148] You will hear what she did. In her own words, she tells her son, "I want

---

[147] The text messages are revealed to be a critical component of the prosecution…*again*.
[148] The Same statements and/or confessions that were used against Appellant Acuna in the first trial.

him down."[149] The evidence will show that this Defendant lured the victim to Donna Lakes and that she contacted her son and her brother-in-law and told them to come, and that she knew Jose would be murdered out there that day.[150] She knew because she is the one person who wanted it done. Now, you're going to hear this presented by way of witnesses. You're going to see text messages. You're going to see the Defendant's statement. And, at the close of all the evidence that's presented, I'm confident that you will have no other choice but to find this defendant guilty. Thank you.

By way of these "opening statements," it's apparent the prosecution had every intent of presenting the same case to both juries, using the same evidence, the same witnesses and the same theory.[151]

The first jury, by finding Defendant was not guilty

---

[149] Yet another critical piece of evidence that was used when Appellant Acuna was tried the first time.

[150] This passage in the prosecution second opening statement is almost word for word from the State's opening statement in the first trial.

[151] 2RR2@13; 2RR7@9 and 1RR2@98

in Cause No. CR-2725-10-H of "knowingly or intentionally "causing the death of Jose Guadalupe Fiscal," decided reasonable doubt existed Appellant Acuna committed the offense of murder.[152] Further, in reaching this verdict, the jury considered the Law of Parties, as they were instructed.[153] Therefore, not only did the first jury decide Appellant Acuna was "not guilty" as a principal, their verdict illustrates reasonable doubt Appellant Acuna acted as a party. But more specifically, by their verdict, the first jury rejected the notion that Appellant Acuna "asked Jose Guadalupe Fiscal to drive to the crime scene" as part of her agreement[154] with Antonio DeLeon and Juan Manuel Salazar that Fiscal be killed; they rejected the notion that Appellant Acuna "texted Juan Manuel Salazar to give him notice that she and Fiscal were on their way

---

[152] TEX.PEN.CODE Section 19.02 (O'Connor's Texas Criminal Codes Plus (2010-2011); 1CR@196, 206; 7.02
[153] 1CR@196
[154] Note the first paragraph of the indictment in CR-4071-11-H is the same as the application paragraph (paragraph 5) of the jury charge in CR-2725-10-H; the jury found in favor of Appellant Acuna in the first trial regarding this issue, while the indictment in the second case charges the same conduct already rejected by that first jury. 1CR@196; 2CR@3

to the crime scene" as part of her agreement[155] with DeLeon and Salazar that Fiscal be killed; they rejected the notion that she texted Antonio DeLeon that she wanted Fiscal "six feet under" or that she texted Deleon that she wanted Fiscal "down so so bad;" they rejected the notion that she "asked Juan Manuel Salazar or Antonio DeLeon to kill Fiscal."[156] We know the first jury in fact deliberated specifically on *these* notions because these very notions were included in the application paragraph of the jury charge in the first case.[157] They believed by their verdict there was "reasonable doubt" Appellant Acuna, acted alone in this endeavor. They believed by the verdict a reasonable doubt existed Appellant Acuna acted together with Juan Salazar and/or Antonio DeLeon with intent to promote or assist the commission of the murder by Salazar and/or

---

[155] Note the second paragraph of the indictment in CR-4071-11-H is the same as the application paragraph (paragraph 5) of the jury charge in CR-2725-10-H; the jury found in favor of Appellant Acuna in the first trial regarding this issue, while the indictment in the second case charges the same conduct already rejected by that first jury. 1CR@196; 2CR@3-4

[156] Note the third and fourth paragraph of the indictment in CR-4071-11-H charges the same conduct as that contained in the application paragraph (paragraph 5) of the jury charge in CR-2725-10-H; the jury found in favor of Appellant Acuna in the first trial regarding this issue, while the indictment in the second case charges the same conduct already rejected by that first jury. 1CR@196; 2CR@8-9

[157] 1CR@196

Deleon. The first jury believed by their verdict that a reasonable doubt existed Appellant Acuna encouraged, directed, aided or even attempted to aid Salazar or DeLeon in their efforts to kill Fiscal.[158]

The jury's verdict of acquittal cannot necessarily be said to be a finding of any "fact."[159] Because that is the rule of law, _Ashe_ requires a reviewing court:

> "to examine the record of the prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter[160] in order to assess the applicability of collateral estoppel. The inquiry must be set in a practical frame and viewed with an eye to all circumstances of the proceedings."[161]

In each case where collateral estoppel barred re-litigation of facts, there's been an acquittal, which in and of itself is not a finding of fact. However, in

---

[158] TEX.PEN.CODE Section 7.02 (O'Connor's Texas Criminal Codes Plus (2010-2011); 1CR@ 196, 200, 202, 206,

[159] _United States v. Watts,_ 519 U.S. 148, 117 S. Ct.633, 136 L.Ed.2d 554 (1991)

[160] 397 U.S. at 444, 90 S. Ct. at 1194 (footnote omitted),

[161] _Id. quoting Sealfon v. United States,_ 332 U.S. 575, 579, 68 S. Ct. 237, 92 L. Ed. 180 (1947).

determining whether collateral estoppel applies, Courts have looked beyond the verdict and examined the record of a prior proceeding and not based rulings on the verdict of acquittal.

It is noteworthy that in both cases against Appellant Acuna, the prosecution's theory was one of conspiracy[162] - arguing that in order to convict Appellant Acuna, the jury would need to find Appellant

---

[162] According to Black's Law Dictionary, <u>Conspiracy</u> is defined as a confederation between two or more persons formed for the purpose of committing, by their joint efforts, some unlawful or criminal act, or some act which is lawful in itself, but becomes unlawful when done by the concerted efforts of the conspirators. A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he: (a) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation of to commit such crime; or (b) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

Compare this to the Parties Charge in the Charge of the Court in the first trial: All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by her own conduct, by the conduct of another for which she is criminally responsible, or both. A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an
offense. 1CR@196; TEX.PEN.CODE Section 7.02 (O'Connor's Texas Criminal Codes Plus (2010-2011); *See Also* <u>Wooden v. State</u>, 101 S.W.3d542, 546 (Tex.App.-Fort Worth 2003, pet. ref'd.)(The evidence must show at the time of the offense the parties were *acting together*, each contributing some part towards their common purpose.)

Compare further with the definition of Conspiracy given the second jury in the jury charge. 2CR81

Obviously then whether one calls it an agreement, acting together toward a common purpose or they call it "conspiracy," it's the same thing.

Acuna *agreed*, *directed*, *texted* the co-conspirators and/or *facilitated* the common goal of murdering Fiscal by luring the victim to a location where the co-defendants were to cause the death of Jose Guadalupe Fiscal, pursuant to some "*agreement*."

In its closing remarks the *second* time around the State argued:[163]

MS. PALACIOS: May it please the Court, ladies and gentlemen of the jury, Defense Counsel. Good morning, ladies and gentlemen. I'm going to have two opportunities to address you this morning because, as the State, I have the burden of proof, okay? So the first thing that I want to talk to you-all about is the Charge of the Court. And I think that, if you think back to voir dire, you will remember me talking about the Charge of the Court, and that is what Judge Garza has just read to you. These are your instructions, okay? When you go back into the jury room, you will take this with you, and you can reference it. Now, we talked

[163] 2RR10@14

about a lot of this information during voir dire. The definition of what "criminal conspiracy" is given to you in here.[164] And if you want to go back and look at it, you should. "With intent that a felony be committed, she agreed with one or more persons or they or one or more of them engaged in conduct that would constitute the offense and she or one or more of them performed an overt act in pursuance of this agreement."[165] That was the definition that you heard in voir dire. And we broke it down and we talked about the different elements of that definition. We talked about the fact that an agreement constituting a conspiracy may be inferred from the acts of the parties. Now, why do I bring that up? Because you're not going to have any type of language saying, "I agree with you. I am going to kill Jose Fiscal." That is not

---

[164] Again, obviously the State relied on evidence of a "conspiracy" in the second trial the same way the State relied on the law of parties in the first trial to show that Appellant Acuna should've been held responsible for the murder because she "orchestrated it." See Opening statement of first trial
[165] Obviously right off the bat, the State in the second trial is relying on a theory of conspiracy…. Compare this to the jury charge in the first trial where the jury was instructed they were to convict if they found that Appellant Acuna……_____

-- that's not what the State's burden is.  You need to infer from the communications that were occurring between the parties that an agreement was made.[166] Now, what type of act are we talking about? An "act" means a bodily movement, whether voluntary or involuntary, and includes speech, okay?  One of the ways that we can prove an act is through speech, the communication, the talking, the instructions that were given.  And I'm going to go into more detail about these instructions later. What is an "overt act"?  It's any act knowingly committed by one of the conspirators in an effort to effect or accomplish some object or purpose of the conspiracy.  The act need not be criminal in nature. The fact that Lupita took Jose out to Donna Lake isn't in itself a criminal act, but she was doing that to accomplish what?  The death of Jose.

---

[166] The same way the State argued Appellant Acuna was responsible for the murder in the first trial.  In the first trial the Jury was charged with finding that Appellant Acuna asked the victim to drive to the crime scene; whereas in the second trial State argued that she lured the victim to the crime scene.  In both cases, the State relied on the same text messages in support of the State's theory that Appellant Acuna, De Leon and Salazar had reached an agreement and had a plan to kill Fiscal, because she communicated through the text messages and she lured the victim and she ultimately "orchestrated the murder." 1CR@196; 2CR@83

Now, you have heard talk about other individuals in this case, and I do not want you to get sidetracked when you go back into that jury room. You are not here today, you haven't been here this week, to decide the fate of Antonio De Leon. That is not your concern. He either will have or has had his day in court with a jury. You are not here to decide the fate of Juan Manuel Salazar. The same thing. He has his own day in court or he had it or he will have it. You are here today to focus on this defendant. Keep your focus on her. Now, Page Two of the charge, under No. 4, begins what we call our "application paragraph," and when you look at that application paragraph, you're going to recognize the wording that you saw in the indictment, okay? Remember, we had four paragraphs in our indictment, and I told you we have four ways that we can prove that this defendant is guilty of this offense. And if you read through Paragraph 4 -- I'm sorry -- No. 4, there's four paragraphs. In

the first paragraph, we're alleging that she's guilty because she took Jose to the location where he would be killed.[167] That's one way we can do it. You'll see the word "or." Okay? And what that means is if you think that I haven't proven that, which I am going to disagree very, very strenuously, go to the next paragraph. You can find that she's guilty by notifying Juan Manuel Salazar that she and Jose Fiscal were traveling to the location where he would be killed.[168] Go back to those text messages. I'll go back into them in more detail later. Again, you're going to see "or." By directing or telling Juan Salazar to kill Jose Guadalupe Fiscal or by directing or telling Antonio Rodriguez De Leon to kill Jose Guadalupe Fiscal.[169]

---

[167] The first jury was charged with finding that Appellant Acuna "asked the victim to drive to the crime scene;" the second jury was charged with finding that Appellant Acuna "lured the victim to the place where he would be killed." 1CR@196; 2CR@82-83

[168] The first jury was charged with finding that Appellant Acuna "gave notice that she and the victim were on their way to the crime scene;" the second jury was charged with finding that Appellant Acuna "notified that she and the victim were traveling to the location where the victim was killed." 1CR@196; 2CR@82-83

[169] The first jury was charged with finding that Appellant Acuna "asked Juan Salazar and Antonio DeLeon to kill victim;" the second jury was charged with finding that Appellant Acuna "directed or told Juan Salazar or Antonio DeLeon to kill victim." 1CR@196; 2CR@82-83

Okay? You can feel that she committed this offense by committing each and every one of these acts, and the argument that I'm going to make to you is she most certainly did, or you can feel that she committed one of those or two of them. Or you can disagree amongst yourselves, but it's the same result. It's still guilty of criminal conspiracy to commit murder. Paragraph 6. You are allowed to consider the previous relationship existing between the accused and the deceased. I'm going to point your attention to the text messages between the **Defendant and Jose.** That's what this paragraph is talking about. You're allowed to consider, based on the evidence that's been presented to you, what was happening between these two parties. And I'm going to make an argument to you that that's motive. I told you the State doesn't have to prove motive, but we have. What was happening? Why was this defendant angry? Go to those text messages and read them. The last thing that I want to address

with you before I give Defense Counsel an opportunity to make their arguments is the "reasonable doubt" language, okay? I want you to think back to voir dire and how we talked about reasonable doubt, and we gave a hypothetical about the rain that had occurred in the parking lot. And I urge you, please use your common sense. Okay? We are not required to prove this case beyond all doubt. Just rely on your common sense and look at the evidence that's been presented to you. And don't look at it piece by piece by piece, as Defense Counsel will probably ask you to do. But look at the totality of the evidence. The witness' affidavits or the witness' statements, the testimony that you heard in the courtroom the text messages that you saw, the Statement of Accused, all of those things together. Look at all of it together. Thank you.

Then:

MS. PALACIOS: Defense Counsel wants to remind you

that you are holding Lupita's life in your hands. What I want you to remember, what I need you to remember is that on July 3rd, 2010, she held Jose's life in her hands. And I want you to remember the choice that she made on that day. She could have stopped what she had set in motion. And was there a plan? Yes, there was a plan. And who was in charge of that plan? This woman. Using your common sense, think about it. Was she going to have him murdered in her home? Would that be a very good plan? No. She had to get him out. Could she -- could she have him murdered in the middle of the night? Based on the evidence that you heard, she couldn't get him near her at night because Alma was back in that house. Now, on July 3, 2010, a man's smoldering body was found beside Donna Lakes. When officers responded, they found that he had been stabbed 45 times. In addition to that, his throat had been slashed. He had been struck over the head; a blow so strong that that alone could have

taken his life.  And if that weren't enough, but you add insult to injury, most of his body was burnt.  He was left there like a piece of trash. And, yes, you had to see the pictures.  You had to know about it because we're here today because *this woman is accused of murder*.  And surprise, surprise, that's exactly what happened. Now, when investigators arrived at the scene, the first step that they took, just as in the course of any investigation, is to determine who this man was. And they found his identification on his body, and they were able to learn that this man was Jose Guadalupe Fiscal.  He was 38 years old. Now, the very first thing you do during the course of an investigation, you work your way backwards. Now we know who he is.  We need to know who he surrounds himself with.  So they got his phone records, and they made notification with the family.  And what did they learn?  He had a wife named Alma, and they went to her. And he had a girlfriend by the name of

Lupita, and they found her, and they spoke to her. And when you -- let's not get sidetracked. She gave -- we heard three statements and three statements of accused are what's in front of you, but there were four statements. The first one was an affidavit, and what do we know about that affidavit? Investigator Palacios told you, she didn't mention knowing anything about what had happened to Joe. She didn't talk about any problems she was having with Joe. She didn't say anything about that. So what did investigators do? They continued to talk to the people that Jose knew. They talked to Renee Mejia. Renee Mejia -- remember, Renee is the girlfriend of Antonio, wife now. And she had been at that home and Rene came forward and she told you, "I went to the police department and I lied when I spoke to them at first." But they spoke to her again, and what did they learn from Renee? They're starting to get an understanding of what type of woman we're dealing

with. Renee told you that she was at the house with Tony; that they were lying in the bedroom together and Juan came in and said, "Let's go." They left. They came back, and what did she say? What did she notice? What happened when they came back? What did she smell? Burnt, something burnt, like trash. She saw Lupe and Juan come into the house, Lupe telling them, "Stay in the room." Who is calling the shots? Lupita. Renee notices Tony's hand. Later, they're over to grandma's house, and what does Renee tell you? What is she told? What is she told, and who tells her? "Keep to the story. Stick together. We were together." And Lupita doesn't say it once. She says it twice. But Defense Counsel would like you to believe that she's scared, she's frozen. If she's frozen, why is this woman continuing to give directions? Because she is in charge of the plan. She's giving the directions before it happened and after it happened. And what else does Renee tell you? Who's

cleaning the Expedition? Well, it's not Lupita. Who is it? Her boys, Juan and Tony. And Defense Counsel wants you to think, oh, well, she's not involved because she wasn't cleaning it. Guess what? She's not involved in the cleanup. Why isn't she involved in the cleanup? Because she's the boss. The boss doesn't get their hands dirty. The workers get their hands dirty. Jessica. You heard testimony from Jessica. That is this defendant's own sister. She was with her the day before she came to court to testify. What did her own sister tell you? Again, Lupita wasn't cleaning the Expedition. But what did she say about her? She was feeling something. She was hurting. But it wasn't for this guy. This isn't who she was hurting for. She was worried about herself. She was worried about what was going to happen to her because, remember, this is all about her. She's thinking, what about me? What's going to happen to me? Am I going to go to jail? Because it's all

about her. Alma Fiscal told you that that phone kept buzzing and buzzing and buzzing all night long, and you know that's true because you have the records. The text messages were coming over and over and over again, so much that what did Jose do? He went and parked his truck somewhere else. Why? Because he knows this woman. He knows what she's capable of doing. Why he had to slowly remove himself from her. He parked his car somewhere else and walked to his house, ladies and gentlemen, so this woman wouldn't see his truck there. And what does he tell his wife to do? "Get your car in the garage. Put the door down." What did Jose know? Jose, Jr. When Jose didn't answer those text messages, she had the audacity to involve his child. I mean, as a parent, you think about that. She was so desperate to talk to Jose, to get him to answer her phone calls, that she could cross a line and bring a child into it. But wait a minute. Let's not forget who we're talking about, right?

Because we're talking about a woman who would be so cold and so calculating, so manipulative that she would put a knife in her own son's hand.  That is the kind of woman that you're talking about.  That is this defendant. As the officers continue their investigation, they get to the text messages.  And I implore you, please, go back and read these.  And the first text messages that I want you to read are the ones from this defendant to Jose.  Close your eyes and you can just almost imagine her, how angry she was sitting there on that phone, message after message after message with no response.  She was boiling.  She was enraged, and she was done. And then look at the last text messages. She's so -- she's so afraid, right?  She's so not in control. What does she do at the end, because it's all about her.  The last messages that she sends, Jose is dead.  She knows that because she was there.  But she sends him messages.  "Amor, where are you?" "Where are you, señor?"  She knows exactly where

he's at.  Those messages are coming in at 1:40, 2:14.  She knows where he's at. So what is she doing?  She's taking care of the one person that she always takes care of.  Is it Jose? Is it her own flesh and blood; her son, Tony?  Or, no. Who is it?  It's Lupita because that's what it's always all about. The communication between her, her son, her brother-in-law, use your common sense, and you take that and you apply it to what you heard from the witnesses, from what they saw, what they experienced. The Defendant's Statement of Accused. Remember, she gave one affidavit where she said she didn't know anything, and then she gave three statements.  We're not talking about a rush to judgment.  We're talking about a murder that took place on July 3rd.  We didn't have an arrest until the early morning hours of July 7th.  A rush to judgment?  This woman came in and gave a statement and took off and was off for a couple of days. That's not a rush to judgment.  The investigators

are getting information.  They're picking up leads. They're learning new information.  That is their job.  That is what they're supposed to do.  That's what we want them to do. When those statements are taken, what Defense Counsel wants you to do is they want you to believe that when an officer, investigator, knows that someone is lying, that's it.  They're just going to stop talking to them. Especially when that person wants to keep talking. What do they expect you to do?  "You want to tell me the truth?  No, no, no, no.  Don't tell me the truth.  Don't tell me the truth.  You want to give it to me, but, no, no, no.  I don't want to hear it because I already got a statement.  We're done." We're not done. You know, that statement is very -- all of them are very, very telling, but the last one, you know, Defense Counsel wants you to believe that they're putting words in her mouth; they're making her say things.  Why include that statement saying, "I regret it.  I loved Jose."  Why include

that statement? I mean, you want this woman; you've got her. Why are you going to put in -- why put in language of love now? You're not going to do that. That language is there because that's what the Defendant said, and so that's what they put in her statement. You know, Jose Fiscal will always be remembered as this 38-year-old man. Always. And his family has many, many, many beautiful moments that they're going to remember with them. But there are some moments that they will never share. Jose, Jr., will walk across the aisle and receive his college degree, and when he does that, his father will not be sitting in the audience beaming with pride. When Abby falls in love, her father won't walk her down the aisle and give her away. When little Gyselle grows up, she probably won't remember the sound of her father's voice. She won't remember the warmth of his hug. And why? Because this woman would not allow it. She was not going to let it happen. She was tired of it. She

was sick of it. Nobody else was going to have Jose. If she couldn't have him, no one would. She showed him no mercy. And just stop and think what 45 stab wounds means. If she would have found someone to shoot him in the back of the head, that would have been an execution, but it would have been more merciful than what happened to Jose that afternoon. And I'm going to ask that of you go back into that jury room and that you hold her responsible for her actions. Thank you.

Clearly in both opening statements and the closing argument in the last trial, the prosecution relied on the same evidence to prove the offense. Further the jury was instructed in the first trial - in Cause No. CR-2725-10-H - that the guilt of a defendant in a criminal case may be proved without evidence that he personally did every act involved in the commission of the crime charged. The law recognizes that ordinarily anything a person can do for himself may also be accomplished through the direction of another person as

an agent or acting together with or under the direction of another person of persons in a joint effort.[170]

The jury, in order to find the Defendant not guilty in Cause No. CR-2725-10-H of "knowingly or intentionally" committing the murder, after considering the charge, necessarily decided those facts in favor of Appellant Acuna.   The first jury decided there was a reasonable doubt Appellant Acuna acting alone *or* in concert or joint effort knowingly or intentionally caused the death of Jose Guadalupe Fiscal.[171] Knowledge, intent, any agreement, any "overt act" performed in furtherance of that agreement were ultimate issues of fact and, because the jury has considered them, the State cannot *re*-litigate this issue.

B. State's Evidence in Cause Number CR-2725-10-H

State's witness Eduardo Aleman from the Hidalgo County District Attorney's Office was called to testify at *both* trials.   Aleman testified in his capacity as a

---

[170] TEX.PEN.CODE Section 7.02 (O'Connor's Criminal Codes Plus (2010-2011); 1CR@196, 2RR10@14,33
[171] 1CR@200

crime scene specialist with the Hidalgo County Sheriff's Department at *both* trials regarding the "evidence."[172] In both trials, he testified about the scene of a homicide at the Donna Lakes on July 3, 2010; he testified regarding observations upon his arrival and described what he observed for both juries.[173],[174] Aleman described video-taping and photographing the crime scene, which video and photos were ultimately entered into evidence at both trials and published to both juries.[175],[176],[177] Aleman is then walked through the photos as both juries are allowed to review them once they are admitted. Note the prosecutor takes her time in both trials to go through each of the photos with this witness. Although numbered differently, these

---

[172] 1RR5@20,21; 2RR7@20-22
[173] Included in his testimony was how and what he observed at the crime scene as regarding the victim's vehicle, the victim's body and the condition of each. He testified he observed the body to be slightly burned or not completely burned. Some of the victims clothing was burned off. He observed the victim's body, which was face down, to have stab wounds. He testified he observed a blood trail between the burnt vehicle and the lake. The victim's hair was burned off of the victim's head. There was blood around the body. 2RR7@24-25; 1RR5@22-24
[174] 1RR5@22-24; 2RR7@22-26
[175] State's Exhibits 46-88 at the first trial represent photos of the crime scene at the Donna Lakes – the crime scene. State's Exhibit 1-31 at the second trial represent photos of the crime scene at the Donna Lakes – the crime scene.
[176] At the first trial, the video of the crime scene is represented by Exhibit 89. 1RR5@33-34; At the second trial, the crime scene video is represented by Exhibit 32. 2RR7@37-38
[177] 1RR5@24-35; 2RR7@29-41

exhibits are the same photos used at both trials. Aleman's testimony served to show the victim was stabbed multiple times and the victim was burned.[178],[179]

State's Witness Fernando Tanguma is called in his capacity as an investigator with the Hidalgo County Sheriff's Department and his association with this investigation.[180] His initial duty here was to interview Appellant Acuna at the Sheriff's Office.[181] The statement taken by Tanguma on July 6, 2010 is published to both juries and the *Affidavit*, represented by State's Exhibit 6 in the first trial and State's Exhibit 55 in the second trial, is read aloud to both juries.[182]

Next Tanguma described a "body search warrant"

---

[178] This evidence will prove critical at both trials as the State sought both times to show Antonio De Leon and Juan Salazar actually stabbed the victim. Aleman's testimony also served the State's theory in both trials by showing that a gas can was found at a canal after receiving "information" from Antonio De Leon – co-defendant. The State's theory at both trials was in fact this gas can was tied to the crime since Aleman has now provided both juries evidence of the victim being burned.
[179] 1RR5@51-52; 2RR7@25-26

[180] 1RR2@102-104; 2RR8@95-96
[181] 1RR2@105; 2RR8@96 Note that before Tanguma even spoke with Appellant Acuna, he already had a theory regarding her involvement: that Appellant Acuna was a jilted lover and that she somehow had some involvement in the killing of Fiscal. 1RR2@128 After Appellant Acuna gave Tanguma the initial affidavit on July 6, 2010, he left her in the custody of Leonor Garcia. 1RR2@122, 131
[182] 1RR2@115-121; 2RR@111-115

executed on Antonio Rodriguez De Leon, Juan Manuel Salazar, Guadalupe Acuna and Ezequiel Gamez.[183] Note the testimony regarding body search warrants is not covered by the prosecution with this witness in the second trial.[184] This is important to note as the DNA evidence/testimony that was adduced at the first trial served to "exclude" Appellant Acuna's DNA from any and all evidence in this case subjected to analysis. In other words, the DNA evidence didn't do the State any good the first time around; it was not necessary the second time around.

State's Witness Leonor Garcia testified in her capacity as an investigator with the Sheriff's Department; she testified at both trials.[185] Garcia obtained phone records of Appellant Acuna and the alleged co-conspirators, Juan Manuel Salazar and

---

[183] 1RR2@123-124 DNA Analyst Edna Zavala would be called to testify at the first trial. Her testimony is discussed herein below. Interestingly, her testimony would serve to show that Appellant Acuna was *excluded* from all evidence submitted for analysis. This is important to consider since she was *NOT* called to testify at the second trial - an example of the State getting another shot at Appellant Acuna and "fixing" their case.
[184] Rather, since the DNA proved to exclude evidence of Appellant Acuna at the first trial and the first jury obviously found in favor of Appellant Acuna the first time around, the State noticeably left this evidence out the second time around.
[185] 1RR2@143; 2RR9@27

Antonio De Leon.[186]

She helped Tanguma interview Appellant Acuna; she told both juries Appellant Acuna wasn't being truthful.[187] Garcia suggested Appellant wanted to "come clean," and another statement was given by Appellant Acuna.[188] This statement was read aloud to *both* juries.[189] Then, Garcia testified about *yet another* statement,[190] represented in the record on appeal as State's Exhibit 8 in the first trial and State's Exhibit 57 at the second trial. This was entered into evidence at both trials and read aloud to both juries.[191]

On cross examination at the *first* trial, Garcia admitted the investigation relied on a theory Appellant

---

[186] 1RR2@144; 2RR9@29; At both trials, there were "*summaries*" of text messages between Appellant Acuna, Jose Fiscal, Antonio De Leon and Juan Salazar published to the juries. They were identified as State's Exhibits 20, 21 and 22 at the first trial._____ At the second trial, these same "*summaries*" are identified as State's Exhibits 37, 38 and 39. 2RR8@6-7
[187] 1RR2@146-149; 2RR9@33-36
[188] 1RR2@150-151, 164; 2RR9@37-38 By this time, Appellant Acuna has given an initial statement to Investigator Palacios; she's given one to Investigator Tanguma and now she gives another to Investigator Leonor Garcia. This 3rd statement was identified as State's Exhibit 7 at the first trial. 1RR2@150-151 It was designated as State's Exhibit 56 at the second trial. 2RR9@39-40
[189] 1RR2@165-169; 2RR9@42-46
[190] This statement will be the 4th statement given by Appellant Acuna and the second statement given to Leonor Garcia. This statement was identified as Exhibit 8 at the first trial and Exhibit 57 at the second trial. 1RR2@172-175; 2RR9@48-50
[191] 1RR2@175; 2RR9@52

Acuna knew what she'd done and she'd planned it. In other words, "*they were going to go.*" "*She knew that they were going to kill him.*" "*She lured him to where she was at.*"[192] Garcia admitted at the first trial, by the time she took the second statement, investigators already had *this* theory of the crime.[193] She admitted the "phone records" cemented the investigators' theory Appellant was involved.[194] State's Exhibit 8 at the first trial and State's Exhibit 57 at the second trial (*same exhibit*) was heavily relied upon by the State at both trials to show Appellant Acuna knew "*they*" were going to do it because she had asked them to do it.

> "On Saturday, July 3, 2010, I knew Jose was going to be killed. I regret asking anyone to kill Jose. I loved him."[195]

Then at the *second* trial, again, Garcia admits the evidence used to arrest Appellant Acuna was the same text messages and same confession. And before that

---

[192] 1RR2@186
[193] 1RR2@188-189
[194] 1RR2@190
[195] State's Exhibit 8 at the first trial and State's Exhibit 57 at the second trial; 1RR2@190; 2RR9@48-50

statement represented by State's Exhibit 8 in the first trial and State's Exhibit 57 in the second trial was taken where Garcia admitted she'd already received the text message evidence from the phone records. She also admitted that investigators "*had all talked.*"[196] Clearly then, at both trials, the evidence by this witness was identical. Further, this witness admitted at both trials that the evidence heavily relied upon in supporting the theory Appellant Acuna was involved was the text message evidence and Appellant Acuna's statements.

*At the first trial*, Garcia responds to the prosecutor that Appellant Acuna was not charged with murder because she knew about the killing of Jose Fiscal. Rather, she was charged with Murder because she "*asked and planned it.*"[197]

Garcia then admitted on cross examination at the first trial that the investigation revealed and she believed Appellant Acuna's son, Antonio De Leon and

[196] 2RR9@54, 57-58
[197] States Exhibit 8 at First Trial ; State's Exhibit 57 at Second Trial; 1RR2@200

Appellant Acuna's brother-in-law, Juan Salazar were the ones who stabbed Jose Fiscal.[198] Garcia advised she corroborated Appellant Acuna communicated with Antonio Rodriguez De Leon and Juan Salazar; that she was "going to the beach; that her vehicle had been seen at the crime scene."[199] This was further driven home to the first jury on re-direct by the prosecutor where she called on Garcia to confirm with regards to the statements Appellant Acuna provided, Antonio Rodriguez De Leon and Juan Salazar were acting on Appellant Acuna's request.

"And the actions that they (*Antonio De Leon and Juan Salazar*) took on July 3rd, 2010 were requested by Appellant Acuna."[200]

Then at the second trial, this portion of Appellant Acuna's statement was read in response to the prosecutor's questioning of Garcia.

"I regret asking anyone to kill Jose. I loved him."

The prosecutor made it a point to ask this witness,

---

[198] 1RR2@203-204
[199] 1RR2@203
[200] 1RR2@205-206

"*who said that*?" Garcia responded "Appellant Acuna said that."[201]

CLEARLY, the State's theory of prosecution in the first case was one of conspiracy even though Appellant Acuna was charged with the substantive offense of Murder.[202] It is equally clear the same theory of prosecution was implemented and relied upon by the State at the second trial, using this witness' testimony.

State's Witness Aaron Reyes Garcia testified he worked and lived close to the Donna Lakes. While eating lunch on July 3, 2010, this witness noticed a plume of smoke coming from the Donna Lakes.[203] He testified upon discovering the plume of smoke, he went to the street to get a closer look; that's when he says he saw a "light brown SUV," possibly an Expedition. This witness identified State's Exhibit 16 as possibly

---

[201] 2RR9@99
[202] TEX.PEN.CODE Section 19.02 (O'Connor's Texas Criminal Codes Plus (2010-2011)….and acquitted…
[203] 1RR3@7-9; 2RR7@46-47

being the same light brown SUV he saw that day.[204] State's Exhibit 16 at the first trial represented a photo of Appellant Acuna's vehicle.[205] CLEARLY, this witness served both prosecutions by placing Appellant Acuna and/or her vehicle at the scene of the murder.

State's Witness Jonathan Palacios testified in his capacity as the lead investigator in this case.[206] Preliminarily, he talks about what he observed at the crime scene and then turned to what his role was in the investigation.[207] Palacios then talked about how he made it to an address on King Drive, an address where the victim's family advised Jose Fiscal was living with his girlfriend, "Lupita."[208] "Lupita" was identified as Appellant Acuna.[209] Palacios takes a statement from Appellant.[210] After, Palacios returned to 2510 King Drive and confirmed the occupants; "Lupita's" son,

---

[204] State's Exhibit 16 in the first trial. 1RR3@11-12 Note that no exhibit was sponsored by this witness at the second trial although he described the same vehicle at the second trial as a brownish/cream SUV like an expedition. 2RR7@48; A photo referred to as State's Exhibit 35 depicting the victim's vehicle would later be sponsored by state's witness Renee Mejia. 2RR7@62-63
[205] 1RR3@10-11
[206] 1RR3@27-29, 30; 1RR4@64-65; 2RR7@89-90
[207] 1RR3@30-33, 35-37; 2RR7@91-92
[208] 2510 King Drive in Donna, Texas was the residence where Appellant Acuna and the victim lived together. 2RR7@94-96
[209] 1RR3@37-38
[210] 1RR3@39-40

Antonio De Leon and brother-in-law, Juan Salazar were among the occupants of the home.[211] These two were named as co-conspirators and were also the subject of the State's theory; they were the *actual* killers.[212] Palacios advised the jury he called upon fellow investigators, Joshua Kaltenbach, Leonor Garcia and even the FBI to assist in obtaining phone records. Phone records were obtained for Appellant Acuna, Antonio De Leon, Juan Salazar and Jose Fiscal.[213] These records were admitted at the first trial as State's Exhibits 19, 19A, 19B and 19C at the first trial amd State's Exhibits 40, 41 and 42 at the second trial representing the phone records of Appellant Acuna, Juan Salazar and Antonio De Leon.[214] These exhibits contained numerous records of communications between various individuals.[215]

"But based on the State's theory that these three

---

[211] The testimony at both trials was developed to identify these two individuals as Co-defendants; they were identified at both trials as the ones with whom Appellant Acuna agreed to kill Jose Fiscal.

[212] 1RR3@41-42; (*See Leonor Garcia's testimony*)

[213] 1RR3@43-44, 50-51, 54-55; 1RR4@19; 2RR7@105-107

[214] 1RR3@53-54; Three disks containing phone records and text messages. A "significant" amount of information is contained on these three disks. 1RR4@22; 2RR8@5-6

[215] 1RR4@22; 2RR8@5

individuals were involved in this killing, we were looking for communications between them and these three numbers were 'filtered' out – those belonging to Appellant Acuna, Juan Salazar and Antonio De Leon. We filtered their numbers out and further filtered by date concentrating on the dates July 1-3, 2010, given that the victim was found July 3, 2010.[216]

Investigators included filters of the victim's phone number.[217] Given the voluminous nature of these phone records,[218] Palacios testified it would be helpful to present the text messages in a summarized format.[219] State's Exhibit(s) 20, 21 and 22 are offered and admitted representing "summaries" of State's Exhibits 19, 19A, 19B and 19C, given that they were very voluminous.[220]

---

[216] 1RR4@22-23; 2RR8@7-8
[217] 1RR4@23; 2RR8@8-23
[218] State's Exhibit 19, 19A, 19B, and 19Cat the first trial. State's Exhibits 40, 41 and 42 at second trial. 2RR8@5-6
[219] 1RR4@24; Investigator and the prosecution actually go through the texts from the victim and Appellant Acuna at both trials. 2RR8@8-23
[220] 2RR8@7-8; 1RR4@24; The summary contained in State's Exhibit 20 at the first trial and State's Exhibit 37 at the second trial contains the text messages between Appellant Acuna and the victim Fiscal from July 1, 2010 at 12:01 a.m. to July 3, 2010 at 4:13 p.m. 1RR4@25; 2RR8@8 State's Exhibit 21 at the first trial and States Exhibit 39 at the second trial represents text

Investigator Palacios and the prosecutor in the both trials publish these exhibits to the jury and go through each text message communication. Referring to the summary of text messages contained in the last page of State's Exhibit 20 in the first trial, there's a text message at 11:24a.m. where Appellant Acuna texted the victim and told him, "*come for me.*"[221] Palacios testified he was able to confirm Appellant Acuna and the victim were together after *that* time.[222] He used the surveillance footage at Pepe's Drive Thru in Donna. Relying on information provided by Appellant Acuna in her Statement of Accused, Palacios in fact recovered video surveillance from Pepe's Drive-thru in Donna where it was determined the victim and Appellant Acuna

---

messages between Appellant Acuna and her son Antonio De Leon between July 1, 2010 at 11:25 a.m. and July 5, 2010 at 4:49 p.m. 1RR4@25; 2RR8@23-24 State's Exhibit 22 at the first trial and State's Exhibit 38 at the second trial represents text messages between Appellant Acuna and Juan Salazar between July 2, 2010 at 4:40 p.m. and July 3, 2010 at 12:14 p.m. 1RR4@26; 2RR8@26

[221] 2RR8@23;

[222] Note that there are three (3) more text messages recorded from Appellant Acuna to the victim after that. Palacios tells the jury that by the time *those* texts are sent, the victim's body had already been found. 1RR4@41; At the second trial, Palacios makes this point as well when he testifies that he was called to the crime scene "before lunch" when these last texts came in after lunch. 2RR8@23

stopped on the day of the murder.[223] This footage was represented by State's Exhibit 18 at the first trial and was published to the jury to corroborate the investigation.[224]

Next, Palacios goes through the summary of text messages between Appellant Acuna and Antonio De Leon; this is done at both trials. Notably, the jury hears about a text from Appellant Acuna to Antonio De Leon, to wit:

"It's like I want him six-feet under." "I want him down so, so bad."[225]

Palacios and the prosecutor then discuss the summary of text messages showing communications between Appellant Acuna and Juan Salazar. Notably here, the prosecution is relying on text messages where Appellant Acuna is receiving texts from Juan Salazar; he tells her to try to take him over there;[226] where Appellant

---

[223] Appellant Acuna in her Statement of Accused told investigators that she and Fiscal had stopped at Pepe's on the way to the Donna Lakes that day. 1RR4@41;

[224] 1RR3@45-48.

[225] 1RR4@41-44; 2RR8@24-25

[226] Given the State's theory that Appellant Acuna "lured" the victim to the Donna lakes where he was murdered, "him" here likely refers to Jose Fiscal. 2RR8@26-28

Acuna tells Juan Salazar that they are on their way to the "beach," which Palacios confirms means the Donna Lakes.[227] There are text messages where Appellant Acuna and Juan Salazar text each other confirming they are in fact "*there*."[228] Palacios testified these texts back and forth about being on the way to the beach and about being *at* the beach showed Appellant Acuna was with the victim and Juan Salazar and Antonio De Leon were in fact together.[229]

These text messages led to a search warrant for 2510 King Drive, where Appellant Acuna lived together with Antonio De Leon and Juan Salazar.[230] Investigators discovered among other items, a beige Ford Expedition, which Palacios described as "recently cleaned and/or detailed."

"It was extremely clean. The carpet had striation patterns as if recently vacuumed, the outside of the vehicle was very clean as if it had just been

---

[227] 1RR4@47; 2RR8@27
[228] 1RR4@44-46; 2RR8@27
[229] 1RR4@46; Palacios confirmed this by way of Appellant Acuna's Statement of Accused and the surveillance footage from Pep's Drive Thru admitted as State's Exhibit 18.  1RR4@47; 2RR8@26-28
[230] 1RR4@47

washed."[231]

Those present at the residence when search warrant was executed included, Appellant Acuna, Antonio De Leon, Juan Salazar and Renee Mejia. Each agreed to accompany investigators to the Sheriff's Department.[232] Later that day, Juan Salazar was arrested and charged with murder; his arrest was based on witness statements, co-defendant's statements of accused, physical evidence and DNA evidence.[233] Antonio De Leon gave a statement; he was arrested that day as well. His arrest was based on his own statement of accused, phone communications, text messages, physical evidence collected, co-defendant's statements and witness statements.[234] Ezequiel Gamez was also arrested and charged with tampering with evidence as the investigation revealed he washed the Expedition belonging to Appellant Acuna.[235] Gamez' arrest was based on co-Defendant statements, witness statements, along

---

[231] 1RR4@47-48; 2RR7@107-108
[232] 1RR4@48-53; 2RR7@108-109
[233] 1RR4@53; 2RR7@110
[234] 1RR4@53-54; 2RR7@110
[235] Ezequiel Gamez was the boyfriend to Appellant Acuna's daughter at the time. 1RR4@52; 2RR7@110-111

with his own statement of accused.[236] Appellant Acuna was also arrested that day; her arrest was based on physical evidence collected, co-defendant statements, witness statements, and phone texts and communications.[237]

After these arrests were made and after additional information was received,[238] another search was conducted at a canal called Relampago. Investigators went there searching for a punctured black trash bag with a tire iron and bloody clothing. Once there, Investigators recovered a gas can and camp fuel.[239] The significance of this find was investigators received "information"[240] there would be found a black bag containing bloody clothing, the gas can used to burn the victim and his vehicle and a knife.[241]

Next, Palacios tells the jury about a knife that

---

[236] 1RR4@54-55
[237] 1RR4@55
[238] Note that the record in the first trial illustrates that co-defendant Antonio De Leon gave his own Statement of Accused. However, when asked about "information received from Antonio De Leon, the defense objected and the witness did not answer. However, it's easy to glean from the record that the information regarding evidence of the murder dumped at a nearby canal in fact came from Antonio De Leon, co-defendant. 2RR7@111-112
[239] 2RR7@112
[240] Note again that this "information" likely came from the Statement of Accused given by co-defendant Antonio De Leon.
[241] 1RR4@57; 2RR7@11-112

was found at 410 Jalapeno Drive home, Appellant Acuna's mother's home. Guadalupe Bustamante Acuna gave information about a knife her daughter, Appellant Acuna gave her to hide. As it turns out, the knife was not affirmatively linked to the crime.[242]

Next, Palacios admits that there was no DNA evidence affirmatively linking Appellant Acuna to this crime.[243] While Palacios admits he took an affidavit from Renee Mejia, he admits no information was provided by Mejia that would have led to Appellant Acuna's arrest.[244] Palacios could not point to any physical evidence corroborating Appellant Acuna's involvement in this crime other than a general statement "the physical evidence was corroborated."[245] Regarding the gas can found at the canal believed by the investigation to be *the* gas can used to burn the victim and his vehicle,

---

[242] 1RR4@59-60, 62, 68, 107-108; 2RR7@113-114
[243] 1RR4@73; 2RR7@114
[244] 1RR4@101; The prosecution did not cover this area at the second trial with this witness. Notably, it did not inure to the benefit of the first prosecution. It's not surprising the prosecution chose to "refine" the presentation at the second trial and leave this out.
[245] 1RR4@106-107; Again, the prosecution did not cover this area at the second trial either with this witness. Notably, it did not inure to the benefit of the first prosecution so it's not surprising the prosecution chose to "refine" their presentation at the second trial and leave this out.

Palacios admits no tests were run on that gas can to confirm it was in fact *the* gas can used in this case.[246]

The prosecution makes sure to re-direct the witness at the first trial and remind the jury that the text messages were considered in determining whether Appellant Acuna should be arrested.[247] Then at the second trial, on cross examination, this witness admits the text message communication was critical in arriving at probable cause for the arrest of Appellant Acuna.[248]

CLEARLY, the State's theory of prosecution in the first case was one of conspiracy even though Appellant Acuna was charged with the substantive offense of Murder.[249] It is equally clear the same theory of prosecution was implemented and relied upon by the State at the second trial, using this witness' testimony.

State's Witness Sandra Rangel is called to testify in her capacity as a Crime Scene Specialist with the

---

[246] 1RR4@108-109
[247] 1RR4@119; 2RR8@6-27
[248] 2RR8@61-62
[249] TEX.PEN.CODE Section 19.02 (O'Connor's Texas Criminal Codes Plus (2010-2011)….and acquitted…

Sheriff's Department.[250] She attended the autopsy. Her duties included photographing the autopsy and recovering physical evidence.[251] She sponsors video and photos that she took at crime scene and at autopsy.[252] She testified about her efforts to recover evidence at that residence as well.[253] Rangel testified about her involvement in executing a search at a canal on Military Highway 281, at Relampago. This is the same canal referred to by Investigator Palacios. She photographed the area and assisted in recovering evidence at the canal. She helped describe the gas can that was recovered.[254]

Rangel described the processing of the beige Expedition recovered in this case, belonging to Appellant Acuna. She helped publish photographs of the vehicle and commented that it was "very, very clean."[255]

State's Witness Edna Zavala was called to testify for the State in her capacity as a DNA Analyst employed

---

[250] 1RR4@142; 2RR8@63
[251] 1RR4@143-144; 2RR8@63-68; Victim's burnt and bloody clothing, fingernail clippings, hair, some currency that was on the victim's person when he died
[252] 1RR4@146-151
[253] 1RR4@151-153
[254] 1RR4@155-159-172; 2RR8@68-69
[255] 1RR4@160-164; RR8@70-72

by DPS and here to testify specifically regarding DPS Crime Lab number L3M84452.[256] She testified about receiving known samples from the suspects and the victim in this case.[257] As it relates to Appellant Acuna, her DNA profile was excluded from *any and all* items of evidence submitted for analysis/comparison.[258] We know that at the first trial, her testimony served no purpose but to "exclude" Appellant Acuna from any affirmative link to this offense. Naturally, then the State decided she would not serve their cause. This is an example of the State learning from the first trial what worked and what did not. The State adjusted and of course this witness was not called back to testify at the second trial.

State's witness Alma Fiscal was called to testify for the State at both trials.[259] She was called to

[256] 1RR4@183; Note that Edna Zavala is NOT called to testify at the second trial. As previously noted, this witness did not serve the prosecution in any way. In fact her testimony at the first trial was that Appellant Acuna was not "biologically connected" to the evidence submitted for analysis. Conceivably then and more likely – *probably* – the State left this witness out when they presented the case to the second jury. It did not inure to the benefit of the prosecution the second time around.
[257] 1RR4@192-193
[258] 1RR4@204-205, 210

[259] 1RR5@156; 2RR9@101

identify the victim, as she is his wife. Exhibit 90 is offered to help the jury identify the victim.[260] She provided context to the marriage and advised the jury they were married 15 or 16 years and they had children of the marriage as well. Then the jury was told the victim was involved with another woman which caused problems between them. The "*other woman*" was Appellant Acuna.[261] An apparent decision was made between Alma Fiscal and the victim; they decided they'd give their marriage another try and decided when and where they'd reunite. During this time, the victim was still in a relationship with Appellant Acuna. The victim's apparent plan was to break off the relationship with Appellant Acuna "little by little."[262]

Alma Fiscal returned to the valley on July 1, 2010 and went to "the house" where she saw the victim and Appellant Acuna home at the time.[263] Alma confronted

---

[260] 1RR5@157; Note that no exhibit was sponsored by this witness to identify the victim, however it was clear from her testimony at the second trial that she was the victim's wife and the father of their children. 2RR9@101-103; Note that Renee Mejia would be called upon to sponsor the photo of the victim in this case. 2RR7@61 referred to as State's Exhibit 33

[261] 1RR5@158-159; 2RR9@102-103

[262] 1RR5@160-161, 185; 2RR9@104

[263] 1RR5@162-163; 2RR9@106

the victim and demanded Appellant Acuna leave the residence, as it was "*her house.*"  Alma testified at that point, the victim spoke with Appellant Acuna and Appellant Acuna had a "pissed off" face;" Appellant Acuna left with a trash bag full of clothes.[264] Later that night, Alma testifies the victim's phone kept going off, ringing and texting, etc.  Alma saw the victim ignore these calls and texts.[265]  That night, the victim's truck was missing from the house, as he claimed it had broken down; the victim also advised Alma to put her car in the garage and lock it.  His reasoning was "*just in case.*"[266]

State's witness Jose Fiscal testified at both trials as well.[267]  This is the victim's son who was called before the jury to discuss how his father, the victim, wanted to get back together with his mom, Alma Fiscal but he couldn't do it right away.  He said the victim told him he needed to pack his things and they needed to move out while she, Appellant Acuna, was

---

[264] 1RR5@163-164, 193; 2RR9@107
[265] 1RR5@166-168; 2RR@108
[266] 1RR5@167, 194; 2RR9@109
[267] 1RR5@187; 2RR9@115

gone.[268] Lastly, this witness left the jury with a comment that Appellant Acuna supposedly made. He told the jury Appellant Acuna remarked in the past if his dad ever messed up with her, to be sure the cops pick her up and a body bag for his dad.[269]

State's witness Renee Mejia testified at both trials.[270] She was the girlfriend/wife of Antonio De Leon. She testified she and her husband lived at the 2510 King Drive address with Appellant Acuna and Juan Salazar.[271] Mejia left the house on July 3, 2010 at around 10:30 or 11 a.m. She returned at around 11:00 or 12:00. When she got back, she, Antonio De Leon and their children were in their room watching movies. While they were there, Juan came in and told Antonio to go with him. They left in Appellant Acuna's expedition.[272] Then Appellant Acuna, Juan and Tony returned together around 12 or 1. Mejia testified she didn't see what they were driving when they came back

---

[268] 1RR5@190-191; 2RR9@118
[269] 1RR5@196; 2RR9@121
[270] 1RR5@94; 2RR7@50
[271] 1RR5@95-96; 2RR7@50-51
[272] 1RR5@97-98; 2RR7@59-60

but she saw Lupita and Juan enter the house and "they were panicking." She saw them run toward the back of the house. She was in her room and she heard them come in and opened her bedroom door.  When she did this, they yelled for me to close the door.  I could smell an odor of "burning" as they ran by my room.[273]  When Antonio got home, he came into the room and Mejia noticed the cut on his finger.  He didn't have that cut when he left the house earlier.  He was acting scared; he was acting different than when he left.[274]  I saw the Expedition after they got home and it was muddy.[275] Antonio told her Juan Salazar had done something to Juan Fiscal.[276]

Later after "Lupita" came back from the sheriff's office, Mejia said that Appellant told everyone to say that they'd been together and to stick to the story. But Mejia said that was a lie because she knew Lupita had left with Joe.[277] Then Juan made a comment that if

[273] 1RR5@99-100-101; 2RR7@65
[274] 1RR5@101-102; 2RR7@66-67
[275] 1RR5@103; 2RR7@68
[276] 1RR5@103
[277] RR5@106, 117 ; 2RR7@69-70, 77

you say anything, you "drop."[278] So the first time Mejia spoke with the investigators, she stuck to the story; later, she went back and told them "everything."[279]

CLEARLY, the State's theory of prosecution in the first case was one of conspiracy even though Appellant Acuna was charged with the substantive offense of Murder.[280] It is equally clear the same theory of prosecution was implemented and relied upon by the State at the second trial, using this witness' testimony.

## CONCLUSION

Appellant Acuna was twice put in jeopardy for the "same offense" in violation of her rights under the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States of America.

Collateral Estoppel guarantees "when an issue of

---

[278] 1RR5@107; 2RR7@77
[279] 1RR5@108

[280] TEX.PEN.CODE Section 19.02 (O'Connor's Texas Criminal Codes Plus (2010-2011)….and acquitted…

ultimate fact has once been determined by a valid and final judgment, the issue cannot again be litigated between the same parties in any future lawsuit. Appellant Acuna avers the evidence in this case illustrates the same theory and evidence was presented to the second jury after acquittal by the first.

This second trial should have been completely barred since the first jury determined an ultimate fact in the former trial which was an essential element of this subsequent prosecution. Further, this subsequent prosecution – even if allowed – should have only been allowed without introduction or argumentation of facts necessarily decided in the prior proceeding.

## **PRAYER**

For the reasons set forth herein, Appellant Acuna prays this Court reverse the judgement of the Court below and render a judgment of acquittal and/or enter an order barring the *re*-trial of Defendant upon the indictment and dismissing this indictment and the prosecution based thereon upon the fact that she was

acquitted in Cause No. CR-2725-10-H of the exact same conduct she was charged with in the case at bar.

In the alternative, this Court should rule that the Doctrine of Collateral Estoppel barred the introduction in the trial of the case at bar of evidence that was used against the defendant in Cause No. CR-2725-10-H. Accordingly Appellant Acuna's rights guaranteed by the 5th Amendment's Double Jeopardy Clause were violated. As such, Appellant Acuna prays this Court reverse and render a judgment of acquittal and/or reverse and Order this indictment dismissed with prejudice.

Appellant Acuna prays that this Court sustain these points and render a judgement of acquittal.

Respectfully submitted,

**O. Rene Flores, P.C.**
1308 S. 10th Ave.
Edinburg, TX 78539
(956) 383-9090
(956) 383-9050

By:*/S/ O. Rene Flores*
O. Rene Flores
SBN 24012637

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Amended Appellate Brief was served in accordance with the rules on the following persons:

Theodore "Ted" Hake
Assistant District Attorney
Hidalgo County District County Attorney
Appellate Division
Hidalgo County Courthouse
100 N. Closner
Edinburg, Texas 78539
By: Hand delivery


Appellant Guadalupe Acuna
TDCJ Number 01886272
Texas Department of Corrections
Mountain View Unit
Gatesville, TX 76528
CM/RRR 7009 2250 0001 0464 8372


/S/ O. Rene Flores
O. Rene Flores



## CERTIFICATE OF COMPLIANCE

Pursuant to TRAP 9.4 (3), I hereby certify this Brief contains 23,606 words.


/S/ O. Rene Flores
O. Rene Flores